NON-CONFIDENTIAL VERSION

2013-1391

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MUELLER COMERCIAL DE MEXICO, S. DE R.L. DE C.V. and SOUTHLAND
PIPE NIPPLES CO., INC.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

TMK IPSCO TUBULARS and ALLIED TUBE AND CONDUIT,

Defendants-Appellees,

and

UNITED STATES STEEL CORPORATION,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
case no. 11-CV-0319, Judge Leo M. Gordon.

BRIEF OF DEFENDANT-APPELLEE
UNITED STATES STEEL CORPORATION

Robert E. Lighthizer
Jeffrey D. Gerrish
Ellen J. Schneider

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7381
Facsimile: (202) 661-9181
E-Mail: InternationalTrade@skadden.com

*Counsel for Defendant-Appellee*
*United States Steel Corporation*

September 30, 2013

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MUELLER COMERCIAL DE MEXICO V UNITED STATES

2013-1391

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee, United States Steel Corporation, certifies the following:

1.    The full name of every party or amicus represented by me is:

United States Steel Corporation

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.    ☒    There is no such corporation as listed in paragraph 3.

5.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Skadden, Arps, Slate, Meagher & Flom LLP: Robert E. Lighthizer,  Jeffrey D. Gerrish, Ellen J. Schneider.

|  |  |
|---|---|
| 9/30/13 | /s/Jeffrey D. Gerrish |
| Date | Signature of Pro Se or Counsel |

Skadden, Arps, Slate, Meagher
 & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7381
Facsimile: (202) 661-9181
E-Mail: InternationalTrade@skadden.com


Jeffrey D. Gerrish
Printed name of counsel

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF THE ISSUES PRESENTED.......................................1

STATEMENT OF FACTS ..................................................................2
    A.   Proceedings before Commerce ...........................................2
    B.   Proceedings at the Court of International Trade..................10

SUMMARY OF THE ARGUMENT .....................................................11

ARGUMENT ...................................................................................13

I.     STANDARD OF REVIEW .........................................................13

II.    Commerce Properly Relied on an Adverse Inference to Replace
     Ternium's Missing Product-Specific Costs ...................................15

     A.   Commerce's Use of AFA In Place of Ternium's Missing Cost
         Data Is Consistent With the Statute and Reasonable............16

     B.   Mueller's Arguments Have No Merit ...................................24

         1.  The Application of AFA Was Not "Unfair" to Mueller ...............24

         2.  This Court Has Not Prohibited AFA That Has An "Indirect"
            Impact on a Cooperative Party.....................................28

II.    Commerce Properly Selected the AFA that it Used for Ternium's
     Missing Costs..........................................................................31

IV.   CONCLUSION..........................................................................39

CERTIFICATE OF COMPLIANCE........................................................40

The confidential material omitted on pages 5, 7-9 and 32-37 contains sales and/or cost data for CWP products submitted by Mueller, TUNA and Ternium, which these parties have asserted is Business Proprietary Information.

# TABLE OF AUTHORITIES

## CASES

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012)..................................................................................28

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)..........................................................................................14

*Consolo v. Federal Maritime Comm'n*, 383 U.S. 607 (1966)..................................14

*Essar Steel Ltd. v. United States*, 678 F. 3d 1268 (Fed. Cir. 2012)............17, 18, 27

*Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012)....................................................................................21

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)...........................................................................31

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010)..................................................................................31, 32

*GPX v. United States,* 893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013)......................26

*International Trading Co. v. United States*, 412 F.3d 1303 (Fed. Cir. 2005).........16

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994) ...........................15

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ........................ 21-22, 23

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ...................19

*PPG Indus. v. United States*, 978 F.2d 1232(Fed. Cir. 1992) ........................... 13-14

*Sahaviriya Steel Indus. Pub. Co. v. United States*,  649 F.3d 1371 (Fed. Cir. 2011) ..................................................................................................13

*SKF USA Inc. v. United States*, 630 F. 3d. 1365 (Fed. Cir. 2011) ...................17, 23

*SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ................................................................................................18, 26

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ................................................................................................31

*Tianjin Magnesium Int'l Co. v. United States*, Court No. 09-535, Slip Op. 2011-17 (Ct. Int'l Trade Feb. 11, 2011)..................................................26

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004).............. 14, 20-21, 32

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996)...........................14

*United States Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010) .........13

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978) .....................................15

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) (2006)......................................................................13

19 U.S.C. § 1677(28) (2006) ...................................................................................23

19 U.S.C. § 1677b(b)(3) (2006) ..............................................................................23

19 U.S.C. § 1677b(f)(1)(A) (2006) .........................................................................23

19 U.S.C. § 1677e(a) (2006) ...................................................................................16

19 U.S.C. § 1677e(b) (2006)........................................................................16, 17, 31

19 U.S.C. § 3512(d) (2006) .....................................................................................16

**OTHER AUTHORITIES**

*Circular Welded Non-Alloy Steel Pipe from Mexico,* 74 Fed. Reg. 64049 (Dep't Commerce Dec. 7, 2009) (prelim. results) ......................................................23

*Circular Welded Non-Alloy Steel Pipe from Mexico*, 75 Fed. Reg. 20342 (Dep't Commerce April 19, 2010) (final results) ...........................................................3

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act; *reprinted in* 1994 U.S.C.C.A.N. 4040................................ *ibid*

Defendant-Appellee United States Steel Corporation ("U.S. Steel"), a domestic producer of circular welded non-alloy steel pipe ("CWP"), hereby submits this response in opposition to the brief filed by Plaintiffs-Appellants Mueller Comercial de Mexico, S. de R.L. de C.V., a Mexican reseller of CWP, and Southland Pipe Nipples Co., Inc., its affiliated importer (collectively, "Mueller").

## STATEMENT OF RELATED CASES

Counsel for U.S. Steel is aware of one case pending in this Court, *Fine Furniture (Shanghai) v. United States*, Nos. 2013-1158, 2013-1172, 2013-1173, 2013-1174, that may directly affect or be affected by this Court's decision in this appeal. Counsel is also aware of one case pending in the United States Court of International Trade, *GPX Int'l Tire Corp. v. United States*, No. 08-0285, that may directly affect or be affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES PRESENTED

1.    Whether the Department of Commerce ("Commerce") properly used adverse facts available ("AFA") to replace the missing cost of production data for merchandise sold by Mueller that was produced and supplied by Ternium Mexico, S.A. de C.V. ("Ternium") where Ternium: (i) was a respondent with a significant dumping margin; (ii) refused to provide the necessary cost information; and (iii) stood to benefit from its lack of cooperation by inducing Commerce to calculate a significantly lower dumping margin for Mueller.

2.    Whether Commerce properly selected from among the facts available to determine the AFA rate to use in place of Ternium's missing cost of production data.

## STATEMENT OF FACTS

### A.    Proceedings before Commerce

Mueller, a reseller, did not produce the subject merchandise.  During the period of review ("POR"), it purchased CWP  from two principal producers, Ternium and Tuberia Nacional, S.A. de C.V. ("TUNA"), and then resold it to customers in Mexico and the United States.[1]

The three companies – Mueller, Ternium and TUNA – were parties in both the administrative review giving rise to this appeal (the "2008-2009 Review" or "Review") as well as in the immediately preceding administrative review.  In the earlier review, Ternium and Mueller did not to respond to Commerce's antidumping questionnaire, and Commerce assigned each of them an AFA duty

---

[1]    Mueller sometimes performed minor further processing of the CWP that it purchased and resold. Issues and Decision Memorandum ("IDM") in *Certain Circular Welded Non-Alloy Steel Pipe from Mexico*, 76 Fed. Reg. 36086 (Dep't Commerce June 21, 2011) ("*Final Results*") at Cmt. 4 (Joint Appendix ("J.A.") at 37) (citing Memorandum Regarding Cost of Production Respondents (June 30, 2010) ("COP Respondents Memo")); Mueller Response to Sec. A of the Antidumping Duty Questionnaire (Feb. 26, 2010) ("Mueller Sec. A Resp.") at A-2 (Public Version) (J.A. 131).

rate of 48.33%.[2] Thus, going into the 2008-2009 Review, merchandise produced by Ternium and exported by either Ternium or Mueller was subject to a 48.33% duty rate unless either company could secure a different rate in that Review.

At the outset of the 2008-2009 Review, Commerce designated Mueller (as a reseller) and Ternium and TUNA (as producers) as mandatory respondents. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 74 Fed. Reg. 68229 (Dep't Commerce Dec. 23, 2009) (notice of init.) (J.A. 55). This meant that each company would receive Commerce's antidumping questionnaire and be required to respond to the best of its ability or face the application of AFA. *See, e.g.,* Letter to Ternium Accompanying Antidumping Duty Questionnaire (Jan. 6, 2010) (J.A. 70). In response to the questionnaire, TUNA stated that it had no direct exports of CWP during the POR and therefore had no sales to report.[3] Letter from TUNA to Commerce (Feb. 5, 2010) at 2 (Public Version) (J.A. 79). Ternium notified Commerce that it did have some exports of CWP during the POR, but it had decided not to respond to the questionnaire. Letter from Ternium to Commerce (Feb. 5, 2010) at 1-2 (J.A. 83-84). Mueller submitted its sales information and other data as requested.

---

[2]  *Circular Welded Non-Alloy Steel Pipe from Mexico*, 75 Fed. Reg. 20342 (Dep't Commerce April 19, 2010) (final results).

[3]  The 2008-2009 Review was subsequently rescinded as to TUNA on this basis. *Final Results* (J.A. 32).

Because Mueller was a reseller, Commerce required the cost of production

("COP") of Mueller's suppliers in order to calculate Mueller's dumping margin.

These data were necessary for Commerce to determine, among other things,

whether Mueller's home market sales were made at below-cost prices and,

therefore, not properly used as the basis for normal value. COP Respondents

Memo (J.A. 90-91). To obtain the COP data, Commerce designated Ternium and

TUNA as "cost of production respondents" and issued them COP questionnaires.

*Id.*

TUNA provided the required COP information, but Ternium did not. While

Ternium filed submissions with Commerce relating to its costs, its data were

incomplete and unuseable. Specifically, Ternium failed to provide product-

specific costs, *i.e.*, costs that pertained to each CWP product model (or

CONNUM).[4] Instead, Ternium provided limited cost data that failed to distinguish

between products on the basis of their dimensions (*i.e.*, size and wall thickness), as

Commerce specifically required.[5]

---

[4]  Commerce refers to such cost data interchangeably as "product-specific" costs and "CONNUM-specific costs." Post-Prelim COP Calc Memo (Ternium) (Feb. 11, 2011) ("Post-Prelim Memo (Ternium)") at 1 (Public Version) (J.A. 68). A "CONNUM," or control number, is Commerce's terminology for a specific product model based on the distinguishing product characteristics that Commerce has identified.

[5]  *See* Post Prelim COP Calc Memo (Mueller) (Feb. 11, 2011) ("Post-Prelim Memo (Mueller)") at 2 (Public Version) (J.A. 134) (finding that Ternium's

*(cont'd)*

NON-CONFIDENTIAL

To explain its deficient response, Ternium stated that it was "willing to

provide information that {was} readily available from its accounting records, as a

courtesy to the Department and to Mueller," but it would not provide more detailed

data.  Ternium Response to Dec. 7 Supplemental COP Questionnaire (Dec. 21,

2010) ("Ternium Dec. 21 Resp.") at 3 (Public Version) (J.A. 108).  Although

Ternium's predecessor-in-interest produced the same CWP using the same facilities

and provided the required COP information in prior administrative reviews,  *id.* at

1-2,  Ternium maintained that the requested information was not "readily available

in the form requested by the Department" and that it was not "practical" for the

company "to compile that information within the limited time available on a matter

that does not directly involve {Ternium's} own exports to the United States."

Ternium Response to June 13 COP Questionnaire (Aug. 20, 2010) at 1 (Public

Version) (J.A. 146).  Commerce granted Ternium's repeated requests for

extensions of time over a six-month period (from July 2010 through December

---

*(cont'd from previous page)*

submitted cost data failed to distinguish between CWP products based on the
key product characteristics identified by Commerce); Ternium Response to Oct.
13 Supplemental COP Questionnaire (Nov. 8, 2010) (APO Version) (J.A. 101)
(showing that [

        ]).

2010), but Ternium still failed to comply.[6]  It asserted that it did not "believe it {was} under any contractual or other legal obligation to supply {such} information."  Ternium Dec. 21 Resp. at 3 (Public Version) (J.A. 108).

In the preliminary results, Commerce assigned Ternium a total AFA rate of 48.33%, which rate would apply to Ternium's direct exports.  To determine Mueller's preliminary margin, Commerce initially used Mueller's reported information, the COP data provided by TUNA, and the cost information reported by Ternium.  Mueller's preliminary margin was 4.81%.  *See  Certain CWP from Mexico*, 75 Fed. Reg. 78216, 78222 (Dep't Commerce Dec. 15, 2010) (prelim. results) (J.A. 64).   Although Commerce used Ternium's non-product-specific cost data for this purpose, it explained that it was doing so solely because of time constraints and that it would require product-specific costs from Ternium for the final results.  Preliminary Results Analysis Memo for Mueller (Dec. 7, 2010) at 14 (Public Version) (J.A. 148).  Two weeks later, Ternium submitted its final questionnaire response where it again refused to supply product-specific costs.  Ternium Dec. 21 Resp. at 2, 5 (Public Version) (J.A. 107, 110).

Not long thereafter, Commerce issued a post-preliminary calculation memorandum revising its preliminary results.[7]  Post-Prelim Memo (Ternium)

---

[6]  *See, e.g.*, Commerce's COP questionnaires directed to Ternium dated July 13, 2010; October 13, 2010; and December 7, 2010 and Ternium's submissions dated Aug. 20, 2010; Nov. 8, 2010; and Dec. 21, 2010.

NON-CONFIDENTIAL

(Public Version) (J.A. 68-69).  It found that Ternium's cost data could not be used because they did not pertain to specific CWP CONNUMs, and it selected AFA to use in place of Ternium's missing cost information.  *Id.*  To determine the AFA rate, it analyzed the relationship between TUNA's product-specific COP and Mueller's reported acquisition costs and found that TUNA's COP was higher than Mueller's acquisition cost for [    ] different CONNUMs.  The record further demonstrated that these [    ] CONNUMs accounted for [                    ] of the merchandise Mueller sourced from TUNA.[8]  Commerce then constructed product-

_____

*(cont'd from previous page)*

[7]    Mueller has referred to this as an "unusual step," and implicitly faults Commerce for taking it.  Brief of Mueller (July 8, 2013) at 6 (Public Version) ("Mueller Br.").  However, by issuing the post-preliminary results, Commerce ensured that the parties had the opportunity to comment on its AFA determination and methodology prior to the final results and that Commerce could address their comments in its final decision.

[8]    The [    ] product models (*i.e.*, CONNUMs) identified by Commerce where Mueller's acquisition cost was less than TUNA's COP for that merchandise were set forth in Attachment 1 of Final AFA Memo (June 13, 2011) ("Final AFA Memo") (APO Version) (J.A. 52).  The quantity of these [    ] CONNUMs accounted for [        ] of Mueller's sales of TUNA merchandise.  Specifically, Mueller sold a total of [        ] pounds ("lb") of TUNA's CWP in both the home and U.S. markets.  *See* Mueller's Home Market and U.S. Sales Databases (Dec. 1, 2010) (APO Document) (J.A. 151-186) and Post-Prelim Analysis Memo (Feb. 10, 2011) ("Post-Prelim Analysis Memo") at HM Log lines 27456-27511 and U.S. Log lines 20438-20496 (APO Version) (J.A. 137-144).  The [    ] CONNUMs identified by Commerce that were sourced from TUNA where the acquisition cost was less than the COP constituted [        ] lbs.  [                        ].  *See* Figure 1, page 34 below; U.S. Steel Br. (CIT) (May 18, 2012) at 2., n. 2.

NON-CONFIDENTIAL

specific costs for merchandise produced and supplied by Ternium by adjusting Mueller's reported acquisition cost for each such product by a factor of [       ]. *Id*. (APO Version) (J.A. 149-150).  This factor was derived from the percentage difference by which TUNA's COP exceeded Mueller's acquisition costs for the three highest of the [   ] CONNUMs.  *Id*.  Using the AFA solely to replace Ternium's missing cost information – and otherwise using the sales and cost information provided by Mueller and TUNA – Commerce calculated a revised preliminary dumping margin for Mueller of 23.89%.  *See* Post-Prelim Analysis Memo (Public Version) (J.A. 66).

Commerce adhered to this methodology for the *Final Results*.  It explained that it gave Ternium repeated opportunities to provide the necessary cost information, but the company persistently refused.  Commerce further noted that Ternium's predecessor, from whom Ternium purchased its CWP factory, successfully participated in prior administrative reviews and that, as a result, Ternium was "well aware of the level of documentation requested by the Department in administrative reviews."  Final AFA Memo at 4 (Public Version) (J.A. 188).  Since Ternium failed to put forth "any effort" to produce the requested information, it failed to act to the best of its ability.  *Id.*  Commerce therefore inferred that the product-specific costs that Ternium withheld would not have been favorable to Ternium's interests, *i.e.*, they would have been greater than  Mueller's

acquisition costs for such merchandise. IDM *Final Results* at Cmt. 4 (J.A. 39).

Commerce found that if it did not select an adverse inference to replace Ternium's

missing costs, Ternium (already subject to a 48.33% antidumping duty rate) "could

continue to produce and sell the subject merchandise for prices less than its normal

value to the U.S. market, by directing it{s} merchandise through Mueller, where it

would have no obligation to ever provide cost of production information." *Id.*

Such a result would be inconsistent with Commerce's obligation to ensure that

Ternium did not benefit from its non-compliance. *Id.*

　　　As in its post-preliminary results, Commerce constructed Ternium's product-

specific cost by adjusting Mueller's acquisition costs for each CONNUM by a

factor of [       ]. Final AFA Memo at 4 (APO Version) (J.A. 49). Commerce

analyzed the selection of this factor to see if it was based on aberrational

information and determined that it was not. Final AFA Memo at 5 (Public Version)

(J.A. 189). Since it concluded that Mueller had cooperated with its information

requests, Commerce used Mueller's reported information as well as TUNA's cost

data together with the AFA for Ternium's missing costs to determine Mueller's

margin. It calculated Mueller's final dumping margin to be 19.81%.[9] *Final Results*, 76 Fed. Reg. at 36089 (J.A. 35).

## B.    Proceedings at the Court of International Trade

Mueller appealed to the Court of International Trade (the "CIT"), arguing that the application of AFA to determine Ternium's COP was unreasonable because Mueller had cooperated in the review. It also challenged Commerce's selection of the specific AFA applied to Ternium's costs. It did not, however, contest Commerce's finding that Ternium was uncooperative. *See* Mueller Complaint (Aug. 22, 2011) ("Complaint") (J.A. 195-198). The CIT affirmed. *Mueller Comercial De Mex., S. De R.L. De C.V. v. United States*, 887 F. Supp. 2d 1360 (Ct. Int'l Trade 2012) ("CIT Opinion") (J.A. 15-31).

The lower court found that Commerce's explanation of its decision to use AFA in lieu of Ternium's missing costs to be "thorough, thoughtful, logical, and complete." CIT Opinion at 13 (J.A. 27). It concluded that Commerce properly considered "the remedial statutory scheme, the intent of Congress, the potential unfairness to Mueller, and the impact of the decision on the accuracy of Mueller's dumping margin." *Id*. As the court found, using its administrative expertise to evaluate these factors, including its obligation to determine margins as accurately

---

[9]    Mueller's margin was revised from 23.89% in the post-preliminary results to 19.81% in the final results based on changes made by Commerce that are not pertinent to this appeal.

as possible, Commerce reasonably determined that the statute authorized the application of an adverse inference to a supplier's missing cost data under the circumstances of this case. *Id.* The court held that Commerce's decision to use AFA was entitled to deference under *Chevron* and that Commerce properly selected the AFA used to construct Ternium's product-specific costs. *Id.* at 13-14 (J.A. 27-28).

## SUMMARY OF THE ARGUMENT

Commerce properly used AFA in place of Ternium's missing COP data when it calculated Mueller's dumping margin. Ternium, a mandatory respondent with its own significant dumping margin, produced a significant portion of the CWP that Mueller subsequently resold. The decision to use AFA for Ternium's missing COP data complied precisely with the statutory factors authorizing Commerce to use AFA. First, Ternium was an interested party. Second, it refused to provide the necessary cost information requested by Commerce, which the statute unambiguously authorized Commerce to obtain and use. Third, Ternium was uncooperative in that it persistently refused to provide the required data despite being given numerous opportunities to comply. And fourth, Commerce selected AFA that was adverse to Ternium's interests, *i.e.*, Commerce inferred that Ternium's withheld cost data would be greater than its reseller's acquisition costs. This was adverse to Ternium because it meant that Ternium, subject to a 48.33%

dumping margin of its own, could not direct its merchandise to the U.S. market through Mueller at an unfairly low antidumping duty rate brought about by Ternium's failure to cooperate.

Commerce's application of AFA was also highly reasonable. Commerce limited its use solely to replace Ternium's missing cost data – and it used Mueller's other data as reported to determine the company's dumping margin. By so doing, Commerce gave effect to Congress' intent that AFA should be applied to ensure that uncooperative parties do not benefit from their lack of cooperation. Commerce also ensured that AFA was not applied to Mueller's other information or used more extensively than necessary. In addition, Commerce's application of AFA was consistent with this Court's decision in *KYD, Inc. v. United States,* where the Court held that Commerce properly found a cooperative importer of subject merchandise to be responsible for the AFA duty rate applied to its unaffiliated exporter with whom the importer had decided to do business.

Moreover, Commerce's decision to use AFA for Ternium's missing costs was not "unfair" to Mueller. If Commerce had not used AFA, it would have given Ternium free reign to "game the system" and benefit from its lack of cooperation by engineering an unfairly reduced dumping margin for its reseller Mueller. Neither Ternium nor Mueller were entitled to reap such a benefit. Indeed, such an outcome would have contravened the express intent of Congress and the decisions

of this Court and would have undermined the antidumping remedy inherent in the statute.

Finally, Commerce's selection of AFA was proper because it was based on non-aberrant transactions between Mueller and its other supplier that took place during the POR. It therefore matched commercial reality and included an incentive to induce future cooperation by Ternium without being unduly adverse.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews a CIT decision regarding Commerce's antidumping duty determinations *de novo*, "applying the same standard of review to Commerce's determinations as did the CIT." *Sahaviriya Steel Indus. Pub. Co. v. United States*, 649 F.3d 1371, 1374 (Fed. Cir. 2011) (citations omitted). Accordingly, this Court will uphold Commerce's determination unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Id.* (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

Substantial evidence is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *United States Steel Corp. v. United States*, 621 F.3d 1351, 1357 (Fed. Cir. 2010) (citation omitted). Under this standard, the Court must sustain Commerce's determination if it is reasonable and supported by the record evidence as a whole, even if there is some evidence that

detracts from Commerce's conclusions. *PPG Indus. v. United States*, 978 F.2d 1232, 1236-37 (Fed. Cir. 1992). Indeed, "'{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Id.* at 1237 (*quoting Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619-20 (1966)).

To determine whether Commerce's actions are in accordance with law, the Court applies the two-prong test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("*Chevron*"). The first prong requires the Court to determine whether Congress' intent on the issue at hand can be ascertained. If the text of the statute alone does not conclusively resolve the issue, then the Court must employ the traditional tools of statutory interpretation to ascertain Congress' intent. *Timex V.I. v. United States*, 157 F.3d 879, 881-82 (Fed. Cir. 1998). Such tools include the "statute's structure, canons of statutory construction, and legislative history." *Id.* 157 F.3d at 882.

If the Court concludes that the intent of Congress is still not clear, the Court will then analyze the issue under the second prong of *Chevron*. This prong requires the Court to determine whether the agency's interpretation "is based on a permissible statutory construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("*Timken*"). "Any reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044

(Fed. Cir. 1996).  Indeed, "{t}o survive judicial scrutiny, an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation. … Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)) (emphasis added).

## II.    Commerce Properly Relied on an Adverse Inference to Replace Ternium's Missing Product-Specific Costs

This case raises an issue that is critical to Commerce's effective enforcement of the antidumping laws:  namely, whether Commerce may properly use AFA to replace the missing COP data of an uncooperative producer to calculate the dumping margin of that producer's reseller.  Or, to state it another way:  whether a producer such as Ternium may avoid its own antidumping duty rate (48.33%) and direct its merchandise to the U.S. market at a substantially reduced rate through the simple expedient of selling through an unaffiliated reseller (Mueller) and refusing – with impunity – to supply Commerce with required cost data.  Notwithstanding such an outcome, Mueller argues that Commerce improperly used AFA for Ternium's missing costs when it calculated Mueller's dumping margin because Mueller was a cooperative party.  Its arguments have no merit.  Under the statute,

Congress' intent as expressed in the Statement of Administrative Action ("SAA"),[10]

and the decisions of this Court, Commerce properly used AFA to replace

Ternium's missing cost information in this case.  The judgment of the CIT should

be affirmed.

### A.    Commerce's Use of AFA In Place of Ternium's Missing Cost Data Is Consistent With the Statute and Reasonable

The antidumping statute provides that Commerce is to apply facts available

when necessary information is not on the record or where, among other reasons,

"an interested party or any other person" has withheld information requested by

Commerce. 19 U.S.C. §1677e(a) (2006).  The statute further provides that if

Commerce "finds that *an interested party* has failed to cooperate by not acting to

the best of its ability to comply with a request for information . . . ,

{Commerce}may use an inference that is adverse to *the interests of that party* in

selecting from among the facts otherwise available" (*i.e.*, it may apply AFA).  19

U.S.C. § 1677e(b) (emphasis added).  Thus, to apply AFA, there must be a finding

that:  (i) Commerce requested information from an interested party; (ii) the

---

[10]  Statement of Administrative Action Accompanying the Uruguay Round Agreements Act; *reprinted in* 1994 U.S.C.C.A.N. 4040.  As this Court has recognized, by statute, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {Uruguay Round Agreements Act} in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d);  *see, e.g., International Trading Co. v. United States*, 412 F.3d 1303, 1312 (Fed. Cir. 2005).

information is not on the record; (iii) the interested party failed to cooperate in providing that information; and (iv) the inference selected is adverse to the "interests of that party."

Notably, the statute does not require that an adverse inference against an uncooperative interested party be incorporated into that party's dumping margin. It requires only that inference be adverse to the *interests* of that party. Nor does the statute prohibit Commerce from applying an adverse inference against the interests of one interested party where it has an impact on the dumping margin of another party. *See SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264, 1276 (Ct. Int'l Trade 2009) ("*SKF USA I*") (recognizing that 19 U.S.C. § 1677e(b) "does not expressly state that Commerce may not adversely affect a party to a proceeding based upon another interested party's failure to cooperate").

Both Congress and this Court have emphasized the importance of AFA in antidumping enforcement. Because Commerce does not have subpoena power, the application of adverse inferences is "the only incentive to foreign exporters and producers to respond to Commerce's questionnaires." SAA at 868; *accord Essar Steel Ltd. v. United States*, 678 F. 3d 1268, 1276 (Fed. Cir. 2012) ("*Essar Steel*") (with no subpoena power, "Commerce's ability to apply adverse facts is an important one"); IDM *Final Results* at Cmt. 4 (J.A. 39) (AFA serves as "the only incentive for an interested party to cooperate"). Where a party has not cooperated,

Commerce is authorized to use AFA "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  SAA at 870.  In fact, the SAA expressly warns against situations where "a party may benefit from its own lack of cooperation."  *Id.*; *Essar Steel*, 678 F.3d at 1276 ("{w}ithout the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship . . . ").

Commerce's decision to use an adverse inference in selecting facts available for Ternium's missing COP data in this case complies precisely with the terms of the statute and with Congress' intent.  First, Ternium was an "interested party."  It exported CWP to the U.S., it was a mandatory respondent with a 48.33% antidumping duty rate, and it produced a significant portion of the CWP that Mueller resold.  Second, Commerce requested that Ternium, as a producer and supplier of Mueller's CWP, provide its COP data for those products.  This request was completely consistent  with the statute.  *See  SKF USA  Inc. v. United States*, 630 F. 3d. 1365, 1371 (Fed. Cir. 2011) ("*SKF USA  II*") (holding that the antidumping statute "unambiguously allows Commerce to prefer the actual production costs of unaffiliated suppliers of finished subject merchandise over {the reseller's} acquisition costs").  Third, Commerce properly found that Ternium failed to cooperate by not supplying its product-specific COP data for the merchandise it sold to Mueller.  Indeed, Commerce afforded Ternium multiple

opportunities over a six-month period to provide the requested data (something that its predecessor-in-interest had been capable of doing), but Ternium persistently refused to do so.[11]

And fourth, as the statute stipulates, Commerce employed an inference that was adverse to "*the interests of {the uncooperative} party*," *i.e.*, Ternium. Specifically, Commerce inferred that Ternium's missing COP data must have been higher than Mueller's acquisition costs because, were it otherwise, Ternium would have provided the requested data.  IDM *Final Results* at Cmt. 4 (J.A. 39). Commerce therefore applied AFA so that Ternium's missing product-specific costs would exceed Mueller's reported acquisition costs.  This was adverse to Ternium's interests because it meant that Ternium, subject to an antidumping duty rate of 48.33%, would not be able to sell its merchandise in the U.S. market through Mueller at an unfairly reduced duty rate brought about through Ternium's failure to provide required data.  Significantly, Commerce limited its adverse inference solely to Ternium's missing COP data and did not make an adverse inference

---

[11]  The "best of the ability" standard requires a respondent to do the "maximum" it is able to do to produce the requested information.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The record here fully establishes the correctness of Commerce's finding that Ternium failed to cooperate in supplying its COP data, and this finding was not challenged by Mueller at the CIT.  *See* Complaint (J.A. 195-198).  To the extent Mueller seeks to reargue this issue before this Court, such argument is both procedurally improper and factually incorrect.

against any of Mueller's other data.   Thus, Commerce's use of AFA for Ternium's COP data constitutes the application of an adverse inference against an uncooperative interested party that was adverse to the interests of that party.  As such, it conforms exactly to the terms of the statute, and by ensuring that Ternium did not benefit from its failure to cooperate, it fully complies with the SAA.

Even if the statute is considered silent on the issue that has been raised, *i.e.*, whether AFA can be used to determine the costs of a non-cooperating producer in calculating the dumping margin of a cooperating exporter, Commerce's use of AFA in this instance was eminently reasonable.  Applying AFA for Ternium's missing COP data furthered the statutory goal of encouraging interested parties that have not acted to the best of their ability to cooperate with Commerce's requests for information.  Moreover, as set forth in the SAA, it ensured that such parties do not "obtain a more favorable result by failing to cooperate than if it had cooperated fully" or "benefit from {their} own lack of cooperation."   Indeed, without the application of AFA to replace Ternium's missing COP data, Ternium – by withholding necessary cost information – could have engineered the calculation of an artificially lower margin rate for its reseller and benefitted from that rate.  The application of AFA for Ternium's missing costs also furthered the inherent remedial purpose of the antidumping statute, which is to ensure that appropriate  – and not artificially reduced – duties are imposed on unfairly traded imports.  *See*

*Timken*, 354 F.3d at 1346. Thus, the application of AFA in this case both comports with Commerce's express authority set forth in the statute and is highly reasonable.

Significantly, this Court has found that Commerce may properly hold a cooperative interested party responsible for AFA applied to an unaffiliated uncooperative party with whom it does business to import the subject merchandise because this promotes the statutory goal of encouraging cooperation with Commerce's requests. In *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) ("*KYD*"), the Court held that an AFA rate calculated for a non-cooperating exporter was properly applied to a cooperating importer of that exporter's goods.[12] In words that are fully apt here, the Court stated that it would not allow the uncooperative producer "to avoid the adverse inferences permitted by statute simply by selecting an unrelated importer, resulting in easy evasion of the means Congress intended for Commerce to use to induce cooperation with its

---

[12]    *See also Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1263 (Ct. Int'l Trade 2012) ("*Fine Furniture*") (holding that Commerce properly used AFA in a countervailing duty case for missing data necessary to determine a cooperative exporter's subsidy rate where the missing data was withheld by a non-cooperative interested party). In *Fine Furniture*, the party that withheld the data was the Government of China. In an antidumping proceeding such as the instant case, the necessity of an adverse inference is even more compelling where the party withholding the data (*i.e.,* Ternium) is a producer with a vested interest in achieving a lower dumping margin for its reseller and who would stand to benefit from its lack of cooperation.

21

antidumping investigations." *KYD*, 607 F.3d at 768.  The Court recognized that this could result in increased duties for cooperative parties, but the overall effect was to encourage compliance with Commerce's requests:

> The prospect that domestic importers will have to pay enhanced antidumping margins because of the uncooperativeness of the exporters from whom they purchase goods may, in some cases, result in the imposition of costs on an individual importer that the importer is unable to avoid. In the aggregate, however, the importers' exposure to enhanced antidumping duties seems likely to have the effect of either directly inducing cooperation from the exporters with whom the importers deal or doing so indirectly, by leaving uncooperative exporters without importing partners who are willing to deal in their products.

*Id.*

While the instant case involves an uncooperative producer and a cooperative exporter and importer,[13] and not an uncooperative exporter and a cooperative importer as in *KYD* (*i.e.*, it is one step removed on the supply chain from the facts in *KYD*), the Court's reasoning applies with equal force.  Prohibiting the use of AFA for Ternium's missing costs would indeed authorize the "easy evasion" of antidumping remedies and encourage parties *not* to cooperate.   As the Court concluded in *KYD,* the use of AFA for Ternium's cost data in the calculation of

---

[13]   Plaintiff-Appellant Southland Nipples is Mueller's affiliate and the U.S. importer of Mueller's merchandise.  Mueller Sec. A Resp. at A-10 (Public Version) (J.A. 132).

Mueller's dumping margin in the instant case is likely to encourage Ternium's future cooperation or induce Mueller to seek other sources of supply.[14]

In addition, in *KYD*, the Court recognized that the antidumping statute specifies that an importer is the party responsible for paying the antidumping duties determined for its exporter. *KYD*, 607 F.3d at 768.   Similarly, in this case, the statute provides that  "where different firms perform the production and selling functions, Commerce may include the costs . . . of each firm in calculating {COP}." SAA at 835. *See* 19 U.S.C. §§ 1677b(b)(3), 1677b(f)(1)(A) and 1677(28); *SKF USA I*, 630 F.3d  at 1371 (holding that the statute "unambiguously" authorizes Commerce to prefer a supplier's COP over acquisition costs when calculating costs for a reseller). Thus, under the statute, a reseller may properly be held responsible for the costs incurred and reported by its unaffiliated producer in the calculation of that reseller's dumping margin.  Plainly, it would be illogical to conclude that Congress

---

[14]  In fact, the record shows that when Mueller requested that Commerce conduct the administrative review at issue, it was aware that:  (i) Ternium supplied a significant quantity of its merchandise; (ii) Commerce would require Ternium's COP; and (iii) Ternium had a history of non-compliance from the prior review. *See Circular Welded Non-Alloy Steel Pipe from Mexico,* 74 Fed. Reg. 64049 (Dep't Commerce Dec. 7, 2009) (prelim. results) (showing that in the immediately preceding administrative review, Ternium submitted a letter to Commerce on April 8, 2009 stating that it would not be responding to Commerce's antidumping questionnaire).  Given that AFA was applied to Ternium's costs in this case, Mueller is far more likely going forward either to require Ternium's compliance as a condition of doing business or to switch suppliers.

unambiguously authorized Commerce to obtain data from both the supplier and the reseller to calculate an accurate dumping margin for the reseller but prohibited Commerce from applying AFA – the only tool available to encourage compliance – for missing costs when the supplier refuses to cooperate.

Thus, given that Commerce here is statutorily entitled to require Ternium's COP data and to use such data to calculate Mueller's dumping margin, it may likewise apply AFA for Ternium's missing costs if it fails to cooperate and, consistent with *KYD*, use that AFA to calculate Mueller's antidumping duty rate.

### B.    Mueller's Arguments Have No Merit

#### 1.    The Application of AFA Was Not "Unfair" to Mueller

Notwithstanding the above, Mueller argues that Commerce violated its "statutory obligations" when it incorporated the AFA for Ternium's COP into Mueller's dumping margin because to do so was contrary to "the notion of fairness." Mueller Br. at 10, 13-14.  This is simply not the case.

In asserting this claim, Mueller relies heavily on the CIT's determination in *SKF USA I*.  *Id*. at 12-14.   In that case, the court found that Commerce unfairly applied an AFA duty rate to the sales of a cooperative reseller because of its supplier's failure to provide its COP within the applicable deadline.  While *SKF USA I*, like the instant case, involved AFA, a cooperative reseller and an uncooperative supplier, the similarities end there.

There are at least three major distinctions.  First, in *SKF USA I*, the unaffiliated supplier was not a party to the proceeding, much less a mandatory respondent with its own dumping margin as Ternium was here.  Second, in *SKF USA I*, Commerce applied the AFA to the cooperative reseller by using it as the *dumping margin* for each of the reseller's sales of the supplier's merchandise.  The AFA was selected to be adverse to the *reseller* and none of the  reseller's sales data for those transactions was used to determine the margin.  By contrast, in this case, Commerce applied the AFA only to Ternium's missing COP data.  It was selected to be adverse to Ternium, and Commerce used Mueller's reported sales data to determine the dumping margin for the sales.  Third, in *SKF USA I*, the supplier, who was not otherwise a party to the proceeding, did in fact provide the required cost data, albeit three business days late.  As the CIT in that case emphasized, instead of applying the highest AFA possible to serve as the margin on the reseller's sales, Commerce could have exercised its discretion to accept the belated cost data or use them as AFA.  In the instant case, by contrast, Ternium never supplied useable cost data despite being given several opportunities and extensions of time to do so.  Thus, Commerce had no choice but to use facts available and to consider Ternium's lack of cooperation.  Indeed, any other approach would have unfairly rewarded Ternium.  In short, the special factors that prompted the CIT to find that the application of AFA to a cooperative respondent

violated the concept of "fairness" in *SKF USA I* are simply not present here.

Accordingly, the facts here compel a different result.[15]

Significantly, this Court expressly considered the CIT's holding in *SKF USA I* when it issued its decision in an appeal from an earlier administrative review in *SKF USA II.* In so doing, this Court did not endorse the holding in *SKF USA I* or agree that the application of adverse facts available was necessarily unfair. Rather, it indicated that applying AFA in such circumstances "may be" unfair, and Commerce must explain why such a concern is "unwarranted or is outweighed by other considerations." *SKF USA II,* 630 F.3d at 1375.

Here, as already shown, there was no unfairness to Mueller because Commerce limited the AFA to the missing cost information, instead of applying it

---

[15]  The CIT followed *SKF USA I* in *Tianjin Magnesium Int'l Co. v. United States*, Court No. 09-535, Slip Op. 2011-17 (Ct. Int'l Trade Feb. 11, 2011). In that case – as in *SKF USA I* and unlike the instant case – the unaffiliated supplier was not a respondent and Commerce applied the AFA – which was a total AFA rate – so that it was adverse to the reseller who had not been found to be uncooperative.

More recently, in *GPX v. United States,* 893 F. Supp. 2d 1296, 1331, n. 45 (Ct. Int'l Trade 2013), a countervailing duty case, the CIT endorsed the holding in *SKF USA I* and stated in a footnote that "to the extent {the CIT's opinion in the instant case} can be read to allow a cooperator's rate in an AD case to be based on the non-cooperation of another party, the court rejects it." In the instant case, however, Commerce did not use an AFA rate as the cooperating party's dumping margin. Its dumping margin was based on its reported sales data and the AFA was limited to the uncooperative party's costs. Notably, the *GPX* court did not analyze any of the facts of the instant case or consider the fundamental distinctions between this case and *SKF USA I.*

as the dumping margin for the affected sales as it had done in *SKF USA I*.  In fact, in the instant case, Commerce simply had no other choice.  If it had not applied AFA – *i.e.*, if it had used "neutral" facts available for Ternium's missing costs as Mueller has proposed –  Commerce would have given Ternium *carte blanche* to engage in "gamesmanship" (by withholding its COP data) and to benefit from its lack of cooperation  by orchestrating an unfairly reduced dumping margin for Mueller.  While such a result might have been more pleasing to Mueller, the SAA and this Court have specifically warned against such outcomes.  SAA at 870; *Essar Steel*, 678 F. 3d. at 1276.

Furthermore, even though Ternium was known to have a history of non-compliance from the prior administrative review, Mueller continued to source its sales from Ternium.  Mueller was simply not entitled to enjoy an artificially reduced duty rate because it selected  an uncooperative supplier that withheld necessary COP data.  Accordingly, to the extent there was an adverse effect on Mueller's dumping margin – an impact that cannot be known and may not even exist[16] –  that impact was outweighed by Commerce's dual obligation to ensure that

---

[16] There is simply no way to know the effect of the AFA on Mueller's dumping margin because, without Ternium's actual product-specific cost data, Mueller's "true" margin cannot be ascertained.  The 4.81% margin calculated by Commerce for the preliminary results was inaccurate and understated because it was based on Ternium's unacceptable and incomplete cost data.  As such, it cannot serve as a proper baseline for Mueller's dumping margin.  If Ternium

*(cont'd)*

Ternium did not benefit from its lack of cooperation and to calculate a dumping

margin for Mueller that was not understated due to Ternium's missing data.

### 2.    This Court Has Not Prohibited AFA That Has An "Indirect" Impact on a Cooperative Party

Mueller also argues that, under this Court's decision in *Changzhou Wujin*

*Fine Chemical Factory Co., v. United States*, 701 F. 3d 1367 (Fed. Cir. 2012)

("*Changzhou*"), Commerce may not apply AFA where it has an "indirect" impact

on a cooperative party.  Mueller Br. at 15-16.   Mueller's reliance on *Changzhou* is

misplaced.

In *Changzhou*, Commerce prepared a remand redetermination in which it

recalculated a separate rate for certain cooperative Chinese companies who had

established that they were entitled to such a rate.  In so doing, it revised a total

AFA rate that it had previously applied to another company who was not a party to

the appeal and who would not be affected by the revised AFA calculation.  The

sole purpose of revising the AFA calculation was so that it could serve as a

predicate for the determination of the separate rate.  To justify its revised AFA rate,

Commerce stated that the only other available information would yield a separate

rate of zero and, therefore, "would not be sufficiently adverse as to effectuate the

_____

*(cont'd from previous page)*
had supplied its product-specific costs, Mueller's dumping margin could well
have been greater than the 19.81% Commerce determined using the partial
AFA.

purpose of the facts available rule to induce respondents to provide . . . complete and accurate information . . . ." *Changzhou*, 701 F.3d at 1373 (internal citation omitted).

The Court rejected Commerce's rationale. It held that Commerce could not justify its revision of an AFA rate based on the goal of deterrence when that rate would not affect any non-cooperative party and "cooperating respondents were the *only* entities impacted by the recalculated rate." *Id.* at 1378 (emphasis in original). The Court specifically distinguished *Changzhou* from *KYD*, where the AFA rate affected both cooperating and non-cooperating parties. *Id*. at 1377, n. 7 (reaffirming that "an AFA rate calculated for a non-cooperating exporter could be applied to a cooperating importer of that exporter's goods").

According to Mueller, *Changzhou* stands for the proposition that Commerce "cannot *indirectly* apply AFA to cooperating respondents." Mueller Br. at 14 (emphasis in original). But as the Court made clear, its decision to reject Commerce's determination in *Changzhou* was not based on the fact that AFA was indirectly applied to a cooperative party; it was based on the fact that the recalculated AFA rate affected *only* cooperating parties. Here, by contrast, the application of AFA adversely affected the uncooperative party, *i.e.*, Ternium, because it deprived Ternium of the opportunity to sell its merchandise to U.S. customers through Mueller at an artificially reduced rate. Thus, the instant case is

29

plainly distinguishable from *Changzhou*. Given that Mueller was Ternium's reseller – and served as a conduit to sell Ternium's merchandise in the U.S. market – the application of AFA for Ternium's costs was properly incorporated into Mueller's margin.

Nor is there any validity to Mueller's assertion that the AFA in this case affected only Mueller and had no effect on Ternium. *Id*. at 16-18. The fact that Mueller's U.S. exports were *bona fide* resales and the fact that Mueller had both home market and U.S. sales and was entitled to its own duty rate are irrelevant to the impact of the AFA – and the resulting dumping margin for Mueller – on Ternium. It is perfectly obvious that Ternium, with a 48.33% margin rate, stood to benefit from a reduced margin for its reseller. A low dumping margin for Mueller significantly expanded Ternium's access to the U.S. market. In other words, the lower Mueller's margin, the more Ternium stood to gain.

Finally, as shown above (*see* n. 16), there is no way to gauge the impact of the AFA on Mueller's dumping margin because, without Ternium's cost data, it is impossible to know what Mueller's margin would have been. Thus, Commerce weighed the competing considerations consistent with the statute, the SAA, and the case law to reach the most accurate margin possible for Mueller without unfairly rewarding Ternium and without exposing Mueller to AFA that exceeded Ternium's

missing costs.  It also ensured that the domestic industry was not deprived of the remedy provided by statute.  Its decision should be upheld.

## II.    Commerce Properly Selected the AFA that it Used for Ternium's Missing Costs

Mueller also contends that, even if the application of AFA was proper, Commerce erred because its selection of the AFA:   (i) did not reflect commercial reality; (ii) was unduly punitive; and (iii) was based on aberrant information. Mueller Br. at 21-22.  These claims are baseless.

It is well established that Commerce's discretion is "particularly great" when it comes to the selection of the information to be used to apply AFA to the missing data of an uncooperative party.  *See  Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010); *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002).  The statute expressly authorizes Commerce to select from a variety of sources, including data from the petition, a final determination in the investigation, a previous review, or "any other information placed on the record." 19 U.S.C.  § 1677e(b).  While AFA can never be completely accurate because the accurate information has not been provided, *SAA*  at 870**,** Commerce's objective is to find a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).   Where the adverse rate "represent{s}

NON-CONFIDENTIAL

commercial reality," *Gallant Ocean,* 602 F.3d at 1323, and at the same time is sufficiently adverse to induce compliance without being "unduly punitive," it will be upheld. *See Timken*, F.3d. at 1345-46.

Contrary to Mueller's assertion, the AFA selected by Commerce here meets these requirements precisely. First, it reflected the commercial reality in this very case. Commerce examined whether TUNA, Mueller's other supplier, reported COPs for merchandise sold to Mueller that exceeded Mueller's acquisition costs. It did. In fact, of the [    ] CONNUMs where Mueller purchased CWP from TUNA, [    ] had COPs above Mueller's acquisition cost. Moreover, these [    ] CONNUMs constituted [        ] of the quantity of Mueller's sales sourced from TUNA. *See* n. 8, above and Figure 1 below at p. 34. Thus, these [    ] CONNUMs were highly representative of the relationship between Mueller's acquisition costs and TUNA's COPs.[17]

---

[17]  Mueller's assertion that, on average, its acquisition costs were [    ] *greater* than TUNA's COPs is misleading. To arrive at this percentage, Mueller weight averaged TUNA's total production quantity for each CONNUM, which included quantities that TUNA produced during the POR but did not sell to Mueller. *See* Mueller Br. at 22 (APO Version); Mueller Case Brief (Feb. 25, 2011) at Attachment (APO Version) (J.A. 117). When the analysis is based on the quantities of merchandise that *Mueller sourced from TUNA* and resold during the POR, it is clear that [    ] of the merchandise Mueller purchased from TUNA and resold was purchased at below cost prices. In fact, these data show that, on average, TUNA's COP was [        ] than Mueller's acquisition costs. *See* Figure 1 below at pp. 34-36 (weight averaging the percentage differences between

*(cont'd)*

NON-CONFIDENTIAL

Commerce then looked at the ratio of the TUNA COP to Mueller's acquisition cost for the [    ] CONNUMs.  It found that for three separate CONNUMs, the ratio was [         ].  It further found that for the five largest transactions and the ten largest transactions (from among the [    ] CONNUMs), the average difference between TUNA's COP and Mueller's acquisition cost was [         ] and [          ], respectively.  Final AFA Memo at 4-5 (APO Version) (J.A. 49-50).  Thus, the [        ] ratio selected by Commerce represented commercial reality for the sale of CWP to Mueller during the POR.  Given that there were three different CONNUMs with that same ratio, the selected factor was plainly not aberrational or based on transactions that were outliers.

Commerce also ensured that the rate was not unduly punitive.  It examined the second highest ratio of TUNA's COP to Mueller's acquisition cost.  This ratio was [       ].  It determined that this rate was not sufficiently adverse to induce Ternium's compliance.  *Id.* at 5 (J.A. 50).  Thus, Commerce considered all of the relevant factors and achieved the proper balance.

---

*(cont'd from previous page)*
TUNA's COP and Mueller's acquisition cost for each CONNUM by the quantities of that CONNUM purchased by Mueller from TUNA).

NON-CONFIDENTIAL

**FIGURE 1**

AVERAGE DIFFERENCE BETWEEN TUNA COP AND MUELLER ACQUISITION COST
FOR TUNA SOURCED MERCHANDISE

| Obs | CONNUM | Difference in Acquisi-tion Cost (%) | TUNA Production Quantity[1] (MT) | Mueller HM/US Sales Quantity of TUNA Sourced Merchandise (Lbs) | Mueller Quantity-weighted Avg Difference (%) |
|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) |

[

[1] Quantity not limited to merchandise sold to Mueller

[2] [                                                                          ]

34                                                    cont'd on page 35

NON-CONFIDENTIAL

cont'd on page 36

NON-CONFIDENTIAL

]

Source:  Columns (a),(b),(c):  Final AFA Memo (June 13, 2011) at Attachment I (APO
Version) (J.A. 52); Post-Prelim Analysis Memo (Feb. 10, 2011) at accompanying
Mueller (MUECOP04) and TUNA (TUNACOP02) Cost of Production Databases
(APO Version) (J.A. 136).

Column (d):  Post-Prelim Analysis Memo (Feb. 10, 2011) at accompanying
Home Market (MUEHM05) and US (MUEUS05) Sales Databases (APO Version)
(J.A. 136).

Mueller is also mistaken when it argues that Commerce's AFA did not account for the potential cost differences between products. Mueller Br. at 21-22. As noted, Commerce applied the factor to Mueller's acquisition costs. The record demonstrates that Mueller's acquisition costs [        ] by CONNUM.[18]  By increasing the acquisition cost for Ternium's sales by the same factor, Commerce arrived at a reasonable approximation of Ternium's product-specific costs with a built-in increase for deterrence.

Nor is there any merit to Mueller's suggestion that the AFA rate was improper because Commerce "never found that Ternium's reported production costs were unreasonable or inaccurate." *Id.* at 22.  Commerce made it perfectly clear that it rejected Ternium's reported cost data because the data were not product-specific. *See* Post-Prelim Memo (Mueller) at 2 (Public Version) (J.A. 134); Final AFA Memo at 5 (Public Version) (J.A. 189) (stating that due to Ternium's reporting failure, "we do not have such information to consider in determining the cost of production for the specific products sold by Ternium to Mueller").  Commerce identified five key product characteristics that were necessary to distinguish among CWP products, and it required that a respondent's

---

[18]  *See* Mueller Response to Dec. 7 Supplemental COP Questionnaire (Jan. 4, 2011) at Ex. 16 (APO Version) (J.A. 194-195) (showing that the acquisition costs (designated in the database as "DM" for direct material cost) ranged from [        ] Pesos/lb to [        ] Pesos/lb and were [        ] for practically every CONNUM).

reported costs account for these differences.   In descending order of importance, these characteristics were:  grade, size, wall thickness, coating and end finish. Even though Mueller purchased merchandise from Ternium with different sizes and wall thicknesses, Ternium did not provide different costs for such merchandise. *See* Mueller Br. at 7 (Public Version); *see also* Ternium Response to Oct. 13 Supplemental COP Questionnaire (Nov. 8, 2010) at Appendix SD-1 (APO Version) (J.A. 101).  In fact, it differentiated its costs for CWP solely with respect to coating and end finish -- the two least important characteristics.  As Commerce properly found, such costs were of no value in calculating Mueller's dumping margin. Considering Ternium's lack of cooperation, AFA was properly used to construct product-specific costs that were otherwise not on the record.

In short, Commerce properly complied with the statute, the SAA, and this Court's holdings when it decided to apply AFA to replace Ternium's missing product-specific cost data and when it assessed the relevant factors to determine the AFA rate to be applied.   Its determination should be upheld in all respects.

## IV.  CONCLUSION

For all of the above-stated reasons, the decision of the CIT in this case

should be affirmed and Commerce's determination should be upheld in all respects.


Respectfully submitted,

/s/Jeffrey D. Gerrish

Robert E. Lighthizer
Jeffrey D. Gerrish
Ellen J. Schneider

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7381
Facsimile: (202) 661-9181
E-Mail: InternationalTrade@skadden.com

*Counsel for Defendant-Appellee United States Steel Corporation*

September 30, 2013

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure,

the undersigned counsel for Defendant-Appellee United States Steel Corporation

certifies that this brief contains 9,045 words.  This word count certification is made

in reliance on the word count feature of Microsoft Word.

<div style="margin-left: 40%;">

/s/Jeffrey D. Gerrish
_____

Jeffrey D. Gerrish
Counsel to Defendant-Appellee
United States Steel Corporation

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7381
Facsimile: (202) 661-9181
E-Mail: InternationalTrade@skadden.com

</div>

September 30, 2013

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Mueller Comercial de Mexico v. United States

**No. 2013-1391**

**PUBLIC CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of September, 2013, I caused service of the foregoing document by electronic filing using the CM/ECF System, which will send a Notice of Docketing Activity to all parties with an email address of record:

Yohai Baisburd, Esq.
**WHITE & CASE LLP**
701 13th Street, N.W.
Washington, D.C. 20005-3807

*On behalf of Mueller Comercial de Mexico,*
*S. de R.L. de C.V., and Southland Pipe*
*Nipples Co., Inc.*

Douglas G. Edelschick, Esq.
Commercial Litigation Branch
C/National Court
Civil Division
**U.S. DEPARTMENT OF JUSTICE**
1100 L Street N.W.
Room 7034
Washington, D.C. 20530

*On behalf of the United States*

Roger B. Schagrin, Esq.
**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, D.C. 20001

*On behalf of TMK IPSCO Tubulars, and*
*Allied Tube and Conduit*

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

/s/ Jeffrey D. Gerrish

By:    Jeffrey D. Gerrish
       Skadden, Arps, Slate, Meagher
        & Flom LLP
       1440 New York Avenue, N.W.
       Washington, D.C. 20005-2111
       Tel: (202) 371-7000
       Fax: (202) 393-5760
       InternationalTrade@skadden.com