2013-1391

─────────────────────────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

─────────────────────────────────────────

MUELLER COMERCIAL DE MEXICO, S. DE R.L. DE C.V.
and SOUTHLAND PIPE NIPPLES CO., INC.,
Plaintiffs-Appellants,

v.

UNITED STATES,
Defendant-Appellee,

TMK IPSCO TUBULARS and ALLIED TUBE AND CONDUIT,
Defendants-Appellees,

and

UNITED STATES STEEL CORPORATION,
Defendant-Appellee.

─────────────────────────────────────────

Appeal from the United States Court of International Trade
in Case No. 11-CV-0319, Judge Leo M. Gordon

─────────────────────────────────────────

BRIEF FOR DEFENDANT-APPELLEE UNITED STATES (NONCONFIDENTIAL VERSION)

─────────────────────────────────────────

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

DOUGLAS G. EDELSCHICK
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC  20044
Tel:  (202) 353-9303

Of Counsel:

NATHANIEL J. HALVORSON
Attorney
Department of Commerce
Office of the Chief Counsel
    for Import Administration

September 30, 2013

Attorneys for Defendant-Appellee
United States

# TABLE OF CONTENTS

**Pages:**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ....................................................vi

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE.................................................................1

STATEMENT OF FACTS .......................................................................3

I.      The Antidumping Duty Order ....................................................3

II.     The 2008-09 Administrative Review ..........................................3

III.    Ternium's Product-Specific Production Cost Data Was Missing..................5

IV.     Commerce Selected A Ratio Based Upon Some Of TUNA's Production Cost Data In Place Of Ternium's Missing Production Cost Data.................10

V.      Commerce Did Not Draw An Adverse Inference Against Mueller ..............13

SUMMARY OF THE ARGUMENT .....................................................14

ARGUMENT .......................................................................................15

I.      The Trial Court Correctly Held That Commerce's Interpretation Of Its Statutory "Facts Available" Authority Is Entitled To Chevron Deference...15

        A.      *Chevron* Deference..............................................................16

        B.      The Statute Is Silent For Purposes Of *Chevron* Step One .................17

        C.      Commerce's Interpretation Of The Statute Is Reasonable For Purposes Of *Chevron* Step Two........................................19

# TABLE OF CONTENTS (continued)

**Pages:**

D.    Mueller's Statutory Interpretation Arguments Are Without Merit.....25

II.    Commerce's Finding That It Selected The Best Available Data From Among The Facts Available In The Record Was Based On Substantial Evidence ...31

CONCLUSION .....................................................................................................39

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 8 and 36 describes the number of products and the range of dimensions for certain products sold by Mueller.  The material omitted on pages 12, 33, and 34 describes the computed difference between Mueller's acquisition prices and the production costs for certain products sold by Mueller.

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                    **Pages:**

*Bomont Indus. v. United States*, 718 F. Supp. 958 (Ct. Int'l Trade 1989) ........ 22-23

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
   701 F.3d 1367 (Fed. Cir. 2012) ..................................................27, 28, 29, 30

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984).................................................... 1, 15, 16, 17, 19, 24, 25

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966)..............................................32

*Corus Staal BV v. United States*, 395 F.3d 1343 (Fed. Cir. 2006) ..........................16

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012).............. 20-21, 32

*F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000) .........................................................18, 20, 32

*GPX Int'l Tire Corp. v. United States*,
   893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013).................................................30

*KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) ...............................28, 29

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ........32

*SKF v. United States*, 630 F.3d 1365, 1371 (Fed. Cir. 2011)..................6, 21, 36, 38

*SKF USA, Inc. v. United States*,
   675 F. Supp. 2d 1264 (Ct. Int'l Trade 2009).........................18, 25, 26, 27, 38

*Suramerica de Aleaciones Laminades, C.A. v. United States*,
   966 F.2d 660 (Fed. Cir. 1992) .......................................................................17

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
   298 F.3d 1330 (Fed. Cir. 2002) ....................................................................33

*Tcherepnin v. Knight*, 389 U.S. 332 (1967)............................................................23

# <u>TABLE OF AUTHORITIES (continued)</u>

**Cases (continued):**                                                                        **Pages:**

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004).....................17, 19, 25

*Tung Mung Dev. Co. v. United States*,
    354 F.3d 1371 (Fed. Cir. 2004) .........................................................22, 25, 31

*Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013) .................................7

*Union Steel v. United States*, 823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) .............7

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)....................................17, 19, 25

*U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010) .........................32

## Statutes:

19 U.S.C. § 1673d...............................................................................................28, 29

19 U.S.C. § 1677....................................................................................................19, 38

19 U.S.C. § 1677b..................................................................................6, 13, 35, 38

19 U.S.C. § 1677e(a)..........................................................................................18, 32

19 U.S.C. § 1677e(b) ......................................................... 1, 14, 16, 17, 18, 19, 25

## Administrative Determinations:

*Antidumping or Countervailing Duty Order, Finding, or Suspended
    Investigation; Opportunity to Request Administrative Review,* 74 Fed.
    Reg. 56,573 (Dep't of Commerce Nov. 2, 2009) ........................................ 3-4

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 76 Fed. Reg.
    36,086 (Dep't of Commerce Jun. 21, 2011) (admin. review 2008-09
    final results) .............................................................................................. 1-2

## TABLE OF AUTHORITIES (continued)

**Administrative Determinations (continued):**                     **Pages:**

*Certain Circular Welded Non-Alloy Steel from Mexico*, 75 Fed. Reg. 78,216
(Dep't of Commerce Dec. 15, 2010) (admin. review 2008-209 prelim.
results)...........................................................................................................4

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 75 Fed. Reg.
20,342 (Dep't of Commerce Apr. 19, 2010) (admin. review 2007-08
final results) .......................................................................3, 12, 35

*Initiation of Antidumping and Countervailing Duty Administrative Reviews
and Request for Revocation in Part,* 74 Fed. Reg. 68,229 (Dep't of
Commerce Dec. 23, 2009)..............................................................4

*Notice of Antidumping Duty Orders:  Certain Circular Welded Non-Alloy
Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and
Venezuela,* 57 Fed. Reg. 49,453 (Dep't of Commerce Nov. 2, 1992) ............3

STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for defendant-appellee United States certifies that he is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.  Counsel for defendant-appellee United States is aware of one case pending in this Court, *Fine Furniture (Shanghai) v. United States*, Nos. 2013-1158, 2013-1172, 2013-1173, 2013-1174, that may directly affect or be directly affected by this Court's decision in this appeal.  Counsel for defendant-appellee United States also is aware of one case pending in the United States Court of International Trade, *GPX Int'l Tire Corp. v. United States*, No. 08-0285, that may directly affect or be directly affected by this Court's decision in this appeal.  Defendant-appellee's counsel is unaware of any other case pending in this or any other court that may directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

1.     Whether the trial court properly afforded *Chevron* deference to Commerce's reasonable interpretation of the agency's governing statute, 19 U.S.C. § 1677e(b), as permitting the agency to consider an adverse inference that it had drawn against a non-cooperative supplier for the limited purpose of informing the agency's judgment when selecting from among the facts available on the record.

2.     Whether the trial court correctly sustained the agency's finding that a ratio based on some cost data supplied by a cooperative supplier was the best information available in place of the non-cooperative supplier's missing cost data.

## STATEMENT OF THE CASE[1]

Plaintiffs-appellants, Mueller Comercial de Mexico, S. de R.L. de C.V. (Mueller Comercial) and Southland Pipe Nipples Co., Inc. (Southland) (collectively, Mueller),[2] appeal from the May 2013 judgment of the United States Court of International Trade, JA14, pursuant to an opinion, *Mueller v. United States*, 887 F. Supp. 2d 1360 (Ct. Int'l Trade 2012), JA15-31 (*Mueller I*), which sustained Commerce's calculation of a dumping margin for Mueller Comercial in

---

[1]  Pursuant to Federal Circuit Rule 28(b), we have not included either a jurisdictional statement or a statement of the standard of review in this brief because we do not disagree with Mueller's corresponding statements.  We have included a statement of the issues, the case, and the facts, because Mueller's corresponding statements are incorrect and inadequate.

[2]  In this brief, we refer to pages in the opening brief of plaintiffs-appellants as "Mueller Br. __."

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 76 Fed. Reg. 36,086 (Dep't of Commerce Jun. 21, 2011) (admin. review 2008-09 final results) (Final Results). JA32-35. In connection with the Final Results, Commerce also issued an "Issues and Decision Memorandum" (Dep't of Commerce June 13, 2011) (I&D Memo), JA36-45, which, in turn, incorporated by reference another memorandum entitled, "Use of Adverse Facts Available (AFA) for Final Results" (Dep't of Commerce June 13, 2011) (AFA Memo), JA46-53.

Mueller Comercial, an exporter, purchased its circular welded non-alloy steel pipe products from two principal suppliers – Ternium Mexico, S.A. de C.V. (Ternium) and Tuberia Nacional, S.A. de C.V. (TUNA) – from whom Commerce requested cost of production data during an administrative review of the applicable antidumping duty order. Commerce needed this data to perform a cost test and to determine Mueller's constructed value for the dumping calculation that is required by statute. Mueller and one of its suppliers (TUNA) cooperated with Commerce's information requests, but Mueller's other supplier (Ternium) refused to cooperate to the best of its ability. Mueller challenges the narrow portion of Commerce's decision that selected the best information available – a ratio based on some of TUNA's production cost data – in place of Ternium's missing production cost data. For the limited purpose of making the determination of what was the best information available on the record, Commerce considered the adverse inference

that it had drawn against Mueller's non-cooperative supplier, Ternium.  The trial

court concluded that this administrative judgment fell within the bounds of

Commerce's discretion when administering the remedial antidumping laws.

## STATEMENT OF FACTS

I.    The Antidumping Duty Order

In November 1992, Commerce issued an antidumping duty order covering

certain circular welded non-alloy steel pipe from Mexico.  *Notice of Antidumping*

*Duty Orders:  Certain Circular Welded Non-Alloy Steel Pipe from Brazil, the*

*Republic of Korea (Korea), Mexico, and Venezuela,* 57 Fed. Reg. 49,453 (Dep't of

Commerce Nov. 2, 1992) (the Antidumping Duty Order).  Commerce conducts

administrative reviews of antidumping orders at the request of foreign and

domestic interested parties to determine whether parties sell merchandise at less

than fair value in the United States.  *See*, *e.g.*, 19 U.S.C. § 1675(a); *Certain*

*Circular Welded Non-Alloy Steel Pipe From Mexico*, 75 Fed. Reg. 20,342 (Dep't

of Commerce Apr. 19, 2010) (admin. review 2007-08 final results).

II.    The 2008-09 Administrative Review

In November 2009, Commerce issued a notice of the opportunity to request

an administrative review of the Antidumping Duty Order for the period from

November 1, 2008, through October 31, 2009 (the period of review).  *Antidumping*

*or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity*

*to Request Administrative Review,* 74 Fed. Reg. 56,573 (Dep't of Commerce Nov. 2, 2009). Later in November 2009, two of the defendant-appellees, Allied Tube and Conduit Corp. (Allied) and TMK IPSCO Tubulars (TMK), requested that Commerce conduct an administrative review of the Antidumping Duty Order with respect to three companies: (i) Mueller Comercial; (ii) Ternium; and (iii) TUNA. *See* JA58, *Certain Circular Welded Non-Alloy Steel from Mexico*, 75 Fed. Reg. 78,216 (Dep't of Commerce Dec. 15, 2010) (admin. review 2008-209 prelim. results) (Preliminary Results). Mueller Comercial and TUNA also self-requested that Commerce conduct an administrative review of the Antidumping Duty Order with respect to their respective companies. *See id.*

In December 2009, Commerce initiated an administrative review of the Antidumping Duty Order for the period of review (the Review). JA54-55, *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part,* 74 Fed. Reg. 68,229-30 (Dep't of Commerce Dec. 23, 2009). Commerce selected Mueller Comercial, TUNA, and Ternium as mandatory respondents for the Review. JA58 (Preliminary Results); JA18 (*Mueller I*)

Commerce sought information as to whether Mueller, TUNA, and Ternium were dumping subject merchandise. JA58 (Preliminary Results). Ternium refused to cooperate and received a total AFA rate of 48.33 percent. *Id.*; JA19 n.3

- 4 -

(*Mueller I*).  TUNA had no shipments to the United States, so Commerce rescinded the review for TUNA and did not assign it a new rate.  JA63 (Preliminary Results); JA19 (*Mueller I*).  Mueller cooperated and provided Commerce with all of the requested price information for its sales so that Commerce could compare Mueller's United States prices to its home market prices.  JA58 (Preliminary Results); JA18 (*Mueller I*).

III.    Ternium's Product-Specific Production Cost Data Was Missing

During the period of review, Mueller purchased and resold merchandise from two principal suppliers:  TUNA and Ternium.  JA37 (I&D Memo); JA18 (*Mueller I*).  Commerce requested that these suppliers report the costs incurred in producing the products sold to Mueller.  JA37 (I&D Memo); JA18 (*Mueller I*).  Commerce sought to obtain production costs for two purposes:  (1) a "cost test" to determine if Mueller's home market sales were made below the cost of production; and (2) a constructed value for comparison to Mueller's United States prices when a price-to-price comparison was not possible.  JA61-62 (Preliminary Results); JA19 (*Mueller I*).

The antidumping statute provides:  "the cost of production shall be an amount equal to the sum of (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in

the ordinary course of business;" plus (B) profit and selling, general, and administrative (SG&A) expenses; and (C) container and covering costs. 19 U.S.C. § 1677b(b)(3). The statute also provides: "constructed value of imported merchandise shall be an amount equal to the sum of (1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," plus (2) profit and SG&A expenses. 19 U.S.C. § 1677b(e). Mueller did not possess all of this information because it resold rather than produced the merchandise at issue. JA37 (I&D Memo); JA18 (*Mueller I*). Thus, Commerce requested cost information directly from the unaffiliated suppliers that manufactured Mueller's merchandise. JA37 (I&D Memo); JA18 (*Mueller I*); *see also SKF v. United States*, 630 F.3d 1365, 1371, 1375-76 (Fed. Cir. 2011) ("On the face of these provisions, Commerce can utilize unaffiliated suppliers' records for cost of production data in lieu of the exporter's acquisition cost.").

Commerce specifically requested that TUNA and Ternium provide production cost data on a product-specific basis. JA37, 40 (I&D Memo); JA19, 30-31 (*Mueller I*). Commerce explained that it was "important that the costs a respondent reports . . . reflect cost differences attributable to the different physical characteristics" of each product because "{t}his ensures that the product-specific costs we use . . . reflect the costs incurred by a respondent" for those specific products. JA41 (I&D Memo); JA31 (*Mueller I*).

Commerce utilizes a system of control numbers (CONNUMs) to identify specific types of products.  *See Union Steel v. United States*, 823 F. Supp. 2d 1346, 1349 (Ct. Int'l Trade 2012), *aff'd*, 713 F.3d 1101, 1104 n.4 (Fed. Cir. 2013).  The CONNUM is a unique identifying code for each product that is based upon a hierarchy of the product's most important physical characteristics.  *Id.*  "The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the merchandise under investigation."  *Id.*

In this case, Commerce identified five product characteristics for certain circular welded non-alloy steel pipe:  (i) grade (the first four digits of the CONNUM); (ii) nominal pipe size (or diameter) (the next three digits of the CONNUM); (iii) wall thickness (the next four digits of the CONNUM); (iv) coating (the next three digits of the CONNUM); and (v) end finish (the last three digits of the CONNUM).  JA73, 75-77 (Commerce standard questionnaire instructions regarding product characteristics and related codes); *see also* JA101 (Ternium response listing CONNUMs for products sold to Mueller).  Therefore, by requesting information from Mueller's suppliers on a product-specific (or CONNNUM-specific) basis, Commerce sought to take into account the differences attributable to each of the product's five physical characteristics.  *See* JA41 (I&D Memo); JA31 (*Mueller I*).

In response to Commerce's data request, TUNA reported its production costs for each product sold to Mueller. JA49 (AFA Memo); JA19 (*Mueller I*). Commerce was able to perform a cost test and construct a value for Mueller's sales of TUNA products based on TUNA's production cost data. JA49 (AFA Memo); JA28 (*Mueller I*). Mueller does not challenge this aspect of Commerce's determination.

Ternium, Mueller's other supplier, did not provide its product-specific production costs. JA37, 39-40 (I&D Memo); JA49 (AFA Memo); JA19 (*Mueller I*). Without Ternium's product-specific cost data, Commerce could not perform a cost test and construct a value for Mueller's sales of Ternium products the way that the agency was able to for Mueller's sales of TUNA products. *See id.*

Although Ternium did not provide product-specific information as Commerce had requested it, Ternium did provide some "limited" production cost data during the administrative review. JA48 (AFA Memo); JA30-31 (*Mueller I*). According to Ternium, Mueller exported [    ] different steel pipe products that were produced by Ternium, with diameter sizes ranging from [    ] to [    ] inches, and with wall thickness ranging from [    ] to [    ] inches. JA76 (Commerce standard questionnaire instructions to account for pipe size and thickness); JA101 (Ternium response). Ternium's data, however, did not account for differences in the cost of production attributable to two product characteristics (the pipe size and

thickness dimensions), even though Ternium's predecessor had provided this information in the past.  JA40-41 (I&D Memo); JA48 (AFA Memo); JA30-31 (*Mueller I*); JA76 (Commerce standard questionnaire instructions regarding pipe size and thickness); JA93, 98 (Ternium responses).

Instead, Ternium's data only accounted for differences in the cost of production attributable to two product characteristics:  (i) coating (designated as either black pipe or galvanized pipe); and (ii) end finish (designated as either plain end or threaded end).  JA77 (Commerce standard questionnaire instructions concerning pipe coating and finish); JA93-96, 97-101 (Ternium responses). Although Ternium provided this limited cost of production data, it repeatedly declined to provide cost data as Commerce had requested it, on a specific, product-by-product basis.  JA40-41 (I&D Memo); JA46, 48 (AFA Memo); JA30-31 (*Mueller I*); JA83-84, 93-94, 98, 106-07 (Ternium responses).

"Due to time constraints," Commerce initially "accepted Ternium's submissions" of limited cost data "for the preliminary results," but "note{d} there are several outstanding issues which include Ternium's failure . . . to account for the cost differences associated with dimensional physical characteristics which will need to be resolved for the final results."  JA62 (Preliminary Results).  In the Final Results, Commerce found that Ternium "was well aware of the level of documentation requested by {the agency} in administrative reviews," JA49 (AFA

Memo), that "Ternium was aware that such record-keeping should have been maintained," and that Ternium "impede{d} {Commerce's} ability to make appropriate comparisons." JA41 (I&D Memo). Commerce decided not to use Ternium's limited cost data because of accuracy concerns. JA40-41 (I&D Memo); JA31 (*Mueller I*). Commerce explained that Ternium's limited cost data did not "reflect cost differences attributable to the different physical characteristics" of the several dozen products reviewed. JA41 (I&D Memo); JA31 (*Mueller I*).

In sum, Ternium, Mueller's non-cooperative supplier, was an interested party and mandatory respondent in the administrative proceeding that failed to comply with Commerce's information requests. This left an information gap with respect to the production costs for Mueller's products manufactured by Ternium, impeded Commerce's administrative review, and resulted in Commerce drawing an adverse inference against *Ternium*. JA39-42 (I&D Memo); JA46-51 (AFA Memo); JA18-19 (*Mueller I*). During the administrative proceedings before Commerce, neither Ternium nor Mueller disputed that the agency properly drew an adverse inference against Ternium. JA33 (Final Results).

IV. **Commerce Selected A Ratio Based Upon Some Of TUNA's Production Cost Data In Place Of Ternium's Missing Production Cost Data**

Commerce "considered the record information available," JA49 (AFA Memo), and "selected from the facts otherwise available, the best information to use in place of Ternium's withheld cost data." JA40, 44 (I&D Memo); JA28-29

(*Mueller I*). The facts available included TUNA's production cost data and Mueller's acquisition cost data. JA49 (AFA Memo). As discussed below, Commerce selected a ratio based on TUNA's production cost data for three products in place of Ternium's missing production cost data, and Commerce declined to select either: (i) TUNA's production cost data for the balance of TUNA's products; or (ii) Mueller's acquisition cost data for Ternium products. JA27-30 (*Mueller I*).

"There is no dispute that, like Ternium, TUNA produced the same types of products in the same country and then sold them to the same exporter (Mueller) during the same period of review." JA29 (*Mueller I*). In place of Ternium's missing cost data needed to determine Mueller's dumping margin, Commerce selected a ratio (an "adjustment factor" – comprised of the percentage difference between Mueller's acquisition costs and TUNA's costs of production for transactions involving three products – multiplied by Mueller's acquisition costs for each of Ternium's products) as the best information available on the record. JA49-51 (AFA Memo); JA26-27, 28-29 (*Mueller I*). In other words, by using this ratio, Commerce estimated the difference between (a) Ternium's *missing* production costs and (b) Mueller's *known* acquisition costs for Ternium products, by computing the difference between (c) TUNA's *known* production costs for transactions involving three products and (d) Mueller's *known* acquisition costs for

those products.  *See* JA49-51 (AFA Memo).  When Commerce made the

administrative judgment concerning what information was the best available,

Commerce considered the adverse inference that it had drawn against Ternium.

JA49-51 (AFA Memo); JA37-45 (I&D Memo); JA27 (*Mueller I*).

Commerce selected the ratio based upon transactions involving three of

TUNA's products because the agency found that the production costs associated

with them (and the accompanying [     ] percent differential with Mueller's

acquisition price) were the best information to use in place of Ternium's missing

cost data.  JA40, 44 (I&D Memo); JA50 (AFA Memo); JA28-29 (*Mueller I*).  In

calculating the ratio, Commerce declined to rely upon transactions involving the

balance of TUNA's products, which had a differential of less than [     ] percent.

JA50 (AFA Memo); JA29 (*Mueller I*).  Commerce reasoned that it had assigned

Ternium a total AFA rate of 48.33 percent during the prior review, and this had not

induced Ternium to cooperate during the current review, leading Commerce to

draw an adverse inference that Ternium refused to cooperate in the current review

because its data would have been less favorable.  JA50 (AFA Memo) (citing

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 75 Fed. Reg. 20,342,

20343 (Dep't of Commerce April 19, 2010) (admin. review 2007-08 final results));

JA39-40, 42, 44 (I&D Memo) (discussing inference against Ternium); JA29-30

(*Mueller I*).

Commerce also declined to rely upon Mueller's acquisition cost data.  JA61-62 (Preliminary Results); JA30 (*Mueller I*).  Congress requires that Commerce determine the costs associated with Mueller's sales of Ternium products by calculating "an amount equal to the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," plus profit and selling, general, and administrative expenses.  *See* 19 U.S.C. § 1677b(e); JA30 (*Mueller I*).  "There is no dispute that Mueller does not possess all of this information because it resells rather than produces the merchandise at issue."  JA30 (*Mueller I*) (citing JA37 (I&D Memo)).  "Commerce also determined that Mueller's acquisition costs for products from its supplier, TUNA, did not equate to the costs of production reported by TUNA for those products."  JA30 (*Mueller I*) (citing JA49-51 (AFA Memo)).  Therefore, Commerce "concluded that supplier production costs are more probative than exporter acquisition costs."  JA30 (*Mueller I*) (citing JA37 (I&D Memo 13)).

V.    Commerce Did Not Draw An Adverse Inference Against Mueller

Commerce declined to draw an adverse inference against Mueller in this case, did not rely upon a dumping rate previously calculated for Mueller, and did not select a rate because it was adverse to Mueller.  JA37, 39-40 (I&D Memo); JA26 (*Mueller I*).  Rather, Commerce largely computed Mueller's dumping margin using facts on the record without reference to an adverse inference.  For example,

Commerce relied upon Mueller's data – including Mueller's home market sales prices, SG&A expenses, and packing costs – when computing Mueller's normal value for all of its price-to-price comparisons. JA58-62 (Preliminary Results). Commerce also relied upon Mueller's United States sales data. *Id.* Further, with respect to Mueller's products sourced from TUNA, Commerce relied upon TUNA's product-specific cost data. JA49 (AFA Memo); JA28 (*Mueller I*). Commerce calculated all aspects of Mueller's dumping margin without reference to an adverse inference, with only one exception. As noted, with respect to Mueller's products sourced from Ternium, Commerce considered the adverse inference that it had drawn against Ternium when the agency selected the best information available in place of Ternium's missing cost data. I&D Memo 5-6; JA49-51 (AFA Memo); JA39-40 (I&D Memo); JA27 (*Mueller I*). Commerce calculated a 19.81 percent weighted-average dumping margin for Mueller. JA35 (Final Results). This challenge by Mueller followed.

## SUMMARY OF THE ARGUMENT

Commerce interpreted a provision of its governing statute, 19 U.S.C. § 1677e(b), as permitting the agency to consider an adverse inference that it had drawn against a non-cooperative supplier for the limited purpose of informing the agency's judgment when selecting from among the facts available on the record. There is no dispute that the statute is silent on this issue. Commerce's

interpretation of the statute is entitled to *Chevron* deference because it is a reasonable one. Commerce considered the remedial statutory scheme, the intent of Congress, the potential unfairness to Mueller, and the impact of its decision on the accuracy of Mueller's dumping margin, and reasonably concluded that all of these factors support the agency's interpretation of the statute. Mueller prefers another interpretation, but Commerce's reasonable interpretation governs under *Chevron*.

Commerce's determination of Mueller's dumping margin also is supported by substantial evidence. Commerce considered the various sets of data on the record and selected the best information available – a ratio based on some of TUNA's production cost data – in place of Ternium's missing production cost data. For the limited purpose of making the determination of what was the best information available on the record, Commerce considered the adverse inference that it had drawn against Mueller's non-cooperative supplier, Ternium. This administrative judgment squarely fell within the bounds of Commerce's expertise and discretion when administering the remedial antidumping laws.

## ARGUMENT

I.    The Trial Court Correctly Held That Commerce's Interpretation Of Its Statutory "Facts Available" Authority Is Entitled To *Chevron* Deference

The parties' briefs in this case present the Court with two interpretations of 19 U.S.C. § 1677e. Mueller cooperated with Commerce's investigation and argues that the agency should ignore Ternium's non-cooperation to be "fair" when

calculating Mueller's dumping margin.  Mueller Br. 12-15.  Commerce found,

however, "consistent with the remedial purposes of the antidumping law, the

statutory policy of encouraging cooperation with information requests, and the

obligation to calculate dumping margins as accurately as possible, that {s}ection

1677e authorizes Commerce, in place of missing cost data needed to determine a

cooperating exporter's dumping margin, to consider an adverse inference against a

non-cooperative supplier when selecting from facts otherwise available on the

record."  JA27-28 (*Mueller I*) (discussing JA40-44 (I&D Memo); *see also* 19

U.S.C. § 1677e(b).  Each party argues that its interpretation is supported by

policies underlying the antidumping statute.  The question for the Court is not

which interpretation is more "fair" or more "reasonable," but rather, whether

Commerce's interpretation is a reasonable one.

    A.    <u>*Chevron* Deference</u>

In reviewing an agency's construction of a statute that it administers, courts

are guided by the two step analysis in *Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc.,* 467 U.S. 837 (1984).  In the first step, courts determine

"whether Congress has directly spoken to the precise question at issue."  *Corus

Staal BV v. United States*, 395 F.3d 1343, 1346 (Fed. Cir. 2006) (quoting *Chevron*,

467 U.S. at 842-43).  "If the intent of Congress is clear, that is the end of the

matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 842-43). "If the statute is silent or ambiguous with respect to the specific issue," however, the second step for the courts is to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843).

"In recognition of Commerce's expertise in the field of antidumping investigations," courts "accord deference to its statutory interpretation in the presence of ambiguity." *Id.* The Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." *Suramerica de Aleaciones Laminades, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992). When Commerce exercises its authority to interpret a statute that it administers, "its interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305; 316 (2009); *accord Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("{a}ny reasonable construction of the statute is a permissible construction").

B.    The Statute Is Silent For Purposes Of *Chevron* Step One

When Commerce initiates administrative proceedings pursuant to the antidumping duty statute, interested parties must cooperate with Commerce's information requests. *See* 19 U.S.C. § 1677e(b). If a respondent withholds

requested information, fails to provide such information in the form or manner requested, or provides information that cannot be verified, the statute requires Commerce to use whatever facts are available to make its determination. 19 U.S.C. § 1677e(a)(2)(A)-(D). When Commerce finds that a respondent has "failed to cooperate by not acting to the best of its ability to comply with an information request," the statute permits the agency to draw adverse inferences when selecting from among the facts available. 19 U.S.C. § 1677e(b). Commerce may rely upon "information derived from (1) the petition, (2) a final determination in the investigation under this title, (3) any previous review . . . , or (4) any other information placed on the record." 19 U.S.C. § 1677e(b). Commerce may rely upon these sources of information to select a proxy that should be a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." *F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Section 1677e is silent as to whether, in place of missing data needed to determine a cooperating exporter's dumping margin, Commerce may consider an adverse inference against a non-cooperative supplier when selecting from among facts otherwise available on the record. *See* 19 U.S.C. § 1677e(b); *see also SKF USA, Inc. v. United States*, 675 F. Supp. 2d 1264, 1276 (Ct. Int'l Trade 2009) (noting "the plain language of 19 U.S.C. § 1677e(b) states that Commerce may use

an inference that is adverse to an 'interested party' who fails to cooperate," "the

term 'interested party' is defined by 19 U.S.C. § 1677(9) of the statute to include

any 'foreign manufacturer, producer, or exporter . . . of subject merchandise,'" and

"19 U.S.C. § 1677e(b) does not expressly state that Commerce may not adversely

affect a party to a proceeding based upon another interested party's failure to

cooperate").  Mueller concedes the statute "is silent" for purposes of *Chevron* step

one.  *See* JA21 (*Mueller I*).  Therefore, in this case, Commerce was called upon to

exercise its well-established authority to interpret section 1677e, a provision of the

Tariff Act of 1930 that Commerce administers, and "its interpretation governs" as

long as it is reasonable.  *See Eurodif*, 555 U.S. at 316; *Timken*, 354 F.3d at 1342.

C.    Commerce's Interpretation Of The Statute Is Reasonable For Purposes
      Of *Chevron* Step Two

There is no dispute that Commerce properly resorted to its "facts available"

authority to fill the information gap caused by Ternium's failure to comply with

Commerce's requests.  Mueller Br. 21 ("Mueller does not challenge

{Commerce's} use of facts available to complete the factual record.").  Nor is it

disputed that Commerce properly drew adverse inferences against Ternium.  *See*

JA33 (Final Results) (Commerce "found in the Preliminary Results that Ternium

failed to cooperate to the best of its ability by withholding information requested,"

and "received no comments regarding its preliminary application of the AFA

dumping margin to Ternium.").  The only question is whether the statute required

Commerce to ignore the adverse inferences against Ternium when it filled the gap. *See* JA21 (*Mueller I*).

Commerce reasonably interpreted section 1677e as "manifesting an intent by Congress to provide the agency with authority to seek such information" and "a mechanism to induce compliance if the interested party's failure to cooperate might affect the dumping margin of another party." JA42 (I&D Memo); JA22 (*Mueller I*); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Without the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations."). Commerce explained that it "does not have subpoena power," and "the use of {AFA} is the only recourse available to the agency to ensure that interested parties provide it with full and complete information." JA42 (I&D Memo); JA22-23 (*Mueller I*); *see also Essar Steel*, 678 F.3d at 1276 ("Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one."). Commerce elaborated that its "ability to use facts available provides the only incentive for an interested party to cooperate." JA42 (I&D Memo); JA23 (*Mueller I*); *see also Essar Steel*, 678 F.3d at 1276 ("The purpose of the adverse facts statute is "to provide respondents with an incentive to cooperate" with Commerce's investigation{.}") (quoting *F.LLI De Cecco*, 216 F.3d at 1032). Commerce further explained that it "has a duty to both ensure that uncooperative

parties do not benefit from their lack of cooperation and to encourage their future compliance." JA42 (I&D Memo); JA23 (*Mueller I*). Commerce, thus, concluded that the statute does not require it to ignore Ternium's non-cooperation when selecting from facts available to fill the information gap. JA42 (I&D Memo); JA23 (*Mueller I*).

Commerce also considered the potential effect that its statutory interpretation would have upon cooperative respondents such as Mueller, consistent with this Court's precedent. *See* JA23 (*Mueller I*); *SKF*, 630 F.3d at 1374-75 & n.6 (Commerce's "{u}se of adverse inferences may be unfair considering SKF has no control over its unaffiliated supplier's actions," and "Commerce must explain why" this "concern is unwarranted or is outweighed by other considerations."). Commerce reiterated that it did "not attempt to penalize Mueller," but rather, it sought "to induce compliance and to ensure that Ternium did not benefit from its non-compliance." JA42-43 (I&D Memo); JA23 (*Mueller I*). Commerce recognized that, as "a general matter, companies that choose to do business with uncooperative parties may also be impacted." JA43 (I&D Memo); JA23 (*Mueller I*). Commerce reasoned that, if it "were unable to apply {AFA} to Ternium's exports through Mueller, Ternium would benefit from its failure to cooperate with" Commerce's "requests for information." JA43 (I&D Memo); JA23-24 (*Mueller I*). Specifically, Commerce explained that, "if we were to accept

Mueller's arguments, the subject merchandise produced and exported by Ternium would be subject to a total {AFA} rate of 48.33" percent, "while Ternium-produced merchandise exported by Mueller would be subject to the much lower weighted-average rate of Mueller." JA43-44 (I&D Memo); JA24 (*Mueller I*). Commerce expressed concern that, under Mueller's interpretation of the statute, "Ternium could continue to produce and sell the subject merchandise for prices less than its normal value to the U.S. market, by directing it{s} merchandise through Mueller, where it would have no obligation to ever provide cost of production information." JA44 (I&D Memo); JA24 (*Mueller I*). Commerce's interpretation is reasonable, therefore, because it encourages compliance with the remedial antidumping law.

Mueller's statutory interpretation notwithstanding, Congress did not intend for parties easily to evade the remedial antidumping law and the statutory duty to cooperate. This question of whether Mueller's statutory interpretation "will encourage collusion between middlemen and producers to circumvent the antidumping laws" is "a quintessential policy choice" that is "committed to the agency's discretion." *See Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1381 (Fed. Cir. 2004). Commerce's goal of preventing non-cooperative suppliers from circumventing the law merely by channeling their products through an intermediary is inherently reasonable. *See Bomont Indus. v. United States*, 718 F.

Supp. 958, 962 (Ct. Int'l Trade 1989) ("The antidumping law is remedial . . . and remedial statutes are to be construed liberally."); *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (there is a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes."). "Commerce carefully considered the remedial statutory scheme," and interpreted section 1677e "consistent with the remedial purposes of the antidumping law." JA27 (*Mueller I*).

"Commerce further considered its duty to determine Mueller's margin accurately and concluded that its decision advances this interest." JA24 (*Mueller I*). Commerce explained: "although premised on the adverse inference that Ternium's actual cost information would not be favorable – otherwise Ternium may not have elected to withhold it from" Commerce – "the selected facts available are intended to produce an accurate, non-punitive, dumping margin for Mueller." JA44 (I&D Memo); JA24 (*Mueller I*). Commerce reasoned that, if it "ignores the fact that Ternium chose to withhold necessary information and fails to apply an adverse inference in the selection of facts available, the resulting dumping margin would not reflect accurately the rate at which Mueller's sales of merchandise produced by Ternium was sold at less than normal value." JA44 (I&D Memo); JA24-25 (*Mueller I*). Commerce concluded that the "application of an adverse inference only to the missing cost of production information that

- 23 -

Ternium has withheld is a reasonable and limited inference based on the information on the record that ensures Ternium does not benefit from its failure to cooperate and also avoids an inaccurate dumping margin for Mueller." JA44 (I&D Memo); JA25 (*Mueller I*). This reasonable approach comports with the remedial statute. JA27-28 (*Mueller I*).

In sum, the trial court correctly held that Commerce's interpretation is "reasonable," entitled to *Chevron* deference, and, therefore, "governs" in this judicial proceeding. JA21-28 (*Mueller I*). "Commerce carefully considered the remedial statutory scheme, the intent of Congress, the potential unfairness to Mueller, and the impact of its decision on the accuracy of Mueller's dumping margin. JA27 (*Mueller I*) (citing JA40-44 (I&D Memo)). Commerce, "{u}sing its administrative expertise, . . . reasonably concluded that all of these factors support the agency's interpretation of the antidumping statute that Congress has charged it to administer. *Id.* Commerce found, "consistent with the remedial purposes of the antidumping law, the statutory policy of encouraging cooperation with information requests, and the obligation to calculate dumping margins as accurately as possible, that {s}ection 1677e authorizes Commerce, in place of missing cost data needed to determine a cooperating exporter's dumping margin, to consider an adverse inference against a non-cooperative supplier when selecting from facts otherwise available on the record." JA27-28 (*Mueller I*) (discussing JA40-44 (I&D Memo);

*see also* 19 U.S.C. § 1677e(b).  "When, as is the case here, 'a challenge to an agency construction of a statutory provision . . . really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.'"  *Tung Mung Dev.*, 354 F.3d at 1381 (quoting *Chevron*, 467 U.S. at 866).  Accordingly, the trial court correctly concluded that Commerce's reasonable interpretation is entitled to *Chevron* deference and must govern.  JA14 (*Mueller I*) (citing *Eurodif*, 555 U.S. at 316; *Timken*, 354 F.3d at 1342).

### D.    Mueller's Statutory Interpretation Arguments Are Without Merit

Mueller argues that it is categorically unreasonable and unfair for any adverse inference against a non-cooperative respondent ever to have a collateral negative effect upon a cooperating party, relying heavily upon *SKF*, 675 F. Supp. 2d at 1264, 1276, which is readily distinguishable.  Mueller Br. 10, 12-14.  In *SKF*, Commerce interpreted section 1677e as authorizing the agency to draw an adverse inference against a cooperative exporter, SKF, based solely upon non-cooperation by SKF's unaffiliated supplier.  *Id.* at 1274-75.  Notably, the "unaffiliated supplier was not a party to the administrative reviews proceeding and, therefore, was not in a position to be assigned a margin reflecting an adverse inference."  *Id.* at 1275.  Instead, Commerce imposed an AFA rate of 17.33 percent upon SKF for purposes of all sales from the non-cooperative supplier during the period covered by the

18th administrative review. *Id.* at 1267, 1275. Commerce selected 17.33 percent

because it was adverse to SKF, representing the highest dumping margin ever

calculated for SKF in any segment of the proceeding, from approximately 15 years

earlier during the third administrative review. *Id.* at 1275. The Court of

International Trade held that Commerce's interpretation of section 1677e in *SKF*

was unreasonable, was "not fair" to the cooperating respondent, and violated

Commerce's duty to determine margins "accurately and according to the relevant

information on the record of the administrative review." *Id.*

In this case, the Court need not revisit whether Commerce's interpretation of

section 1677e from *SKF* is reasonable because Commerce did not rely upon it

during the administrative proceeding below. As the trial court explained,

"Commerce did not draw an adverse inference against Mueller, did not rely upon a

dumping rate previously calculated for Mueller, or select a rate because it was

adverse to Mueller." JA26 (*Mueller I*) (discussing JA37, 39-40 (I&D Memo)).

"Rather, Commerce selected a ratio based on some of TUNA's cost data as the best

information available on the record in place of Ternium's missing cost data."

JA26-27 (*Mueller I*) (same). "When Commerce made the judgment as to what

information available on the record was best to evaluate Mueller's cost of

production for Ternium products, Commerce considered the adverse inference that

it had drawn against Ternium – a mandatory respondent to whom Commerce had

assigned a margin reflecting an adverse inference." JA27 (*Mueller I*) (same). The trial court correctly held that, unlike *SKF*, "this case involves a different interpretation of Section 1677e by Commerce, a different methodology for selecting from the facts available, and a different record." *Id.* The trial court reasoned that, unlike in *SKF*, "Commerce's decision-making here appears thorough, thoughtful, logical, and complete." *Id.*

The *SKF* decision is distinguishable for another reason. In *SKF*, the unaffiliated supplier actually did submit the requested data, albeit three days late, and Commerce rejected it as untimely. *SKF*, 675 F. Supp. 2d at 1273. In *SKF*, therefore, Commerce possessed all of the necessary data but chose not to consider it. *Id.* In contrast, in this case, Ternium "repeatedly refused" to provide any product-specific cost of production data despite Commerce's numerous requests, JA37 (I&D Memo), and the absence of this necessary information on the record further distinguishes the circumstances in *SKF*. Mueller's argument that the reasoning in *SKF* applies here, Mueller Br. 14, is not correct.

Mueller also relies on *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012), which does not support Mueller's argument either. Mueller Br. 14-16, 18. In *Changzou*, Commerce calculated an "all-others rate," which applies to companies that are not individually investigated, by "construct{ing} a hypothetical AFA rate" that "was not assigned to any

individually investigated entity," and then by averaging it with a "*de minimis* rate

for" a cooperative respondent.  701 F.3d at 1375-76.  The applicable statute

governing "all-others" rates, however, "contemplates that the separate rate will

generally be calculated by taking a weighted average of dumping margins assigned

to individually investigated entities, excluding those margins that are zero, *de

minimis*, or determined entirely on the basis of AFA."  *Id.* at 1376 (citing 19 U.S.C.

§ 1673d(c)(5)(A)).  The applicable statute also provided that, when "the dumping

margins for all individually investigated entities are zero, *de minimis*, or

determined entirely on the basis of AFA, Commerce 'may use any reasonable

method to establish the estimated all-others rate for exporters and producers not

individually investigated, including averaging the estimated weighted average

dumping margins determined for the exporters and producers individually

investigated.'"  *Id.* (quoting 19 U.S.C. § 1673d(c)(5)(B)).

  "The appellant {in *Changzou*} {did} not argue{} that the simple average

methodology suggested by the statute {for calculating the "all-others" rate} is

unreasonable in all circumstances, nor even that it is necessarily unreasonable

when applied to cooperating parties."  *Id.*  Indeed, *Changzou* cited *KYD, Inc. v.

United States*, 607 F.3d 760 (Fed. Cir. 2010), as a case where "an AFA rate

calculated for a non-cooperating exporter could be applied" where it had collateral

consequences for a "cooperating importer of that exporter's goods."  *Changzou*,

701 F.3d at 1376 n.7.  But, neither *Changzou* nor *KYD* decided the precise question presented here.  *Cf.* Mueller Br. 19 (arguing "*KYD* is not relevant to this case").

"Rather, the appellant {in *Changzou*} argued . . . that Commerce's stated reasons for its approach were arbitrary, because deterrence is not a sufficient justification when calculating a rate that solely affects cooperating respondents." *Id.*  In *Changzou*, the Court held that "the only AFA rates contemplated under section 1673d(c)(5)(B)'s simple average methodology are those determined for 'individually investigated' parties," which "are generally based on verified data, and bear a reasonable relationship to the party's actual business practices," whereas, "Commerce's {s}ubstitution of a hypothetical 'AFA rate' inapplicable to any individually investigated party is neither suggested nor compelled by the statute, particularly where the sole impact of that substitution will be on cooperating parties." *Id.* at 1379 (internal citations omitted).

Unlike *Changzou*, in this case, Commerce did not calculate an all-others rate, apply section 1673d(c)(5), construct a hypothetical AFA rate that was inapplicable to any investigated party, or average *de minimis* and hypothetical AFA rates to calculate a dumping margin.  Here, Commerce computed all aspects of Mueller's dumping margin without reference to an adverse inference with only one exception:  the production costs for Mueller's products sourced from Ternium.  When selecting the best available information in place of Ternium's missing cost

data, Commerce held that its "facts available" authority pursuant to section 1677e did not require the agency to ignore an adverse inference that it already had drawn against Ternium. *Changzou* did not address this question.

Next, Mueller relies on *dicta* in a footnote in *GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1331 n.45 (Ct. Int'l Trade 2013), to incorrectly argue that "another judge at the CIT has already rejected" the trial court's reasoning from this case. Mueller Br. 14. The footnote used qualified language and was based upon a cursory assessment of the trial court's decision in this case. To the extent that the footnote *dicta* in *GPX* may have suggested that the trial court's decision in this case was not correct, *GPX* is wrong and is not binding precedent in this Court.

Finally, Mueller argues that there was no record evidence that Ternium attempted to circumvent the Antidumping Duty Order by selling products through Mueller in this particular case, Mueller Br. 16-17, but, even if true, this misses the point. Commerce has a broader responsibility to interpret its "facts available" authority pursuant to section 1677e to promote the remedial purposes of the statute, to prevent all regulated parties from circumventing the law, and to foster cooperation in all cases. Mueller asserts with little elaboration that "Ternium cannot use Mueller as a conduit for any alleged dumping" because Mueller has its own dumping rate, Mueller Br. 17-18, but Ternium plainly could avoid the application of its own 48.33 percent dumping margin by shipping its products

through Mueller, and, thus, take advantage of Mueller's significantly lower 19.81 percent dumping margin. JA35 (Final Results). Mueller also quibbles about how best to promote cooperation, Mueller Br. 18-19, but that is a matter that squarely falls within Commerce's expertise and judgment. *See Tung Mung*, 354 F.3d at 1381 (question of whether statutory interpretation "will encourage collusion between middlemen and producers to circumvent the antidumping laws" is "a quintessential policy choice" that is "committed to the agency's discretion"). For these reasons, Mueller's statutory arguments are without merits.

## II. Commerce's Finding That It Selected The Best Available Data From Among The Facts Available In The Record Was Based On Substantial Evidence

Commerce "considered the record information available," JA49 (AFA Memo), and "selected from the facts otherwise available, the best information to use in place of Ternium's withheld cost data." JA40, 44 (I&D Memo); JA28-29 (*Mueller I*). The facts available included TUNA's production cost data and Mueller's acquisition cost data. JA49 (AFA Memo). Commerce selected a ratio based on some of TUNA's production cost data to fill the information gap, and the agency declined to select either TUNA's cost data for the balance of TUNA's products or Mueller's acquisition costs for Ternium products. JA49-51 (AFA Memo); JA37-45 (I&D Memo); JA26-30 (*Mueller I*). As demonstrated below, Commerce's finding that it selected "the best information" available on the record is supported by substantial evidence. *See Essar Steel*, 678 F.3d at 1272

("Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1357 (Fed. Cir. 2010)); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (substantial evidence may be "'less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence'") (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)).

"{T}he anti-dumping statute leaves much to agency discretion in making anti-dumping determinations." *F.LLI De Cecco*, 216 F.3d at 1032.  This Court "has repeatedly held that Commerce's special expertise makes it the 'master' of the anti-dumping law, entitling its decisions to great deference from the courts." *Id.* "Thus, factual determinations supporting anti-dumping margins are best left to the agency's expertise." *Id.* Congress specifically recognized that Commerce often is called upon to make these factual determinations based upon less than perfect information. *See* 19 U.S.C. § 1677e(a).  The statute governing Commerce's "facts available" authority provides:   "If necessary information is not available on the record," or "an interested party or any other person withholds information that has been requested," then Commerce "shall . . . use the facts otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a).  When selecting

MATERIAL SUBJECT TO PROTECTIVE ORDER OMITTED

from among the facts otherwise available, "the discretion granted by the statute" to Commerce is "particularly great." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338-39 (Fed. Cir. 2002). Here, in the absence of Ternium's missing cost data, Commerce was called upon to utilize its administrative expertise in selecting from the facts otherwise available.

Commerce compared "TUNA's sales to Mueller and TUNA's cost of production information for specific products," "perform{ed} a cost test on TUNA's sales to Mueller," and selected "the sales transaction between TUNA and Mueller made . . . at the greatest percentage below the cost of production," which was [     ] percent. JA49 (AFA Memo); JA28 (*Mueller I*). This "was the same as the next two transactions with a differential between the sale price and the cost of production (*i.e.*, all three were" [     ] percent). JA50 (AFA Memo); JA28 (*Mueller I*). Commerce determined that a ratio based on TUNA's production costs for these transactions was most probative of Ternium's withheld cost data. JA40, 44 (I&D Memo) (Commerce "has selected from the facts otherwise available, the best information to use in place of Ternium's withheld cost data"); JA50 (AFA Memo) (Commerce selected the "most probative evidence" available); JA28-29 (*Mueller I*).

Mueller, nevertheless, argues that the ratio based on some of TUNA's cost data bears "no relationship to the missing information." Mueller Br. 20-22. To the

MATERIAL SUBJECT TO PROTECTIVE ORDER OMITTED

contrary, by using this ratio, Commerce was able to estimate the difference

between (a) Ternium's *missing* production costs and (b) Mueller's *known*

acquisition costs for Ternium products, by computing the difference between

(c) TUNA's *known* production costs for transactions involving three products and

(d) Mueller's *known* acquisition costs for those products.  *See* JA49-51 (AFA

Memo).  "There is no dispute that, like Ternium, TUNA produced the same types

of products in the same country and then sold them to the same exporter (Mueller)

during the same period of review."  JA29 (*Mueller I*).  The production costs from

the aforementioned TUNA transactions were neutral facts available on the record,

not a punitive adverse inference, as Mueller incorrectly claims.  Mueller Br. 20-21.

Mueller also argues that production costs for the TUNA transactions that

Commerce selected are not probative of *all TUNA transactions*, Mueller Br. 21-22,

but this misses the point.  Commerce selected a ratio based on some of the TUNA

transactions because the production costs associated with them (and the

accompanying [     ] percent differential with Mueller's acquisition price) were

the best information to use in place of *Ternium's missing cost data*.  JA40, 44

(I&D Memo); JA50 (AFA Memo); JA29 (*Mueller I*).  Commerce reasonably

declined to rely upon TUNA's cost data for the balance of TUNA's products,

which had a differential of less than [   ] percent, because Commerce determined

that they were "insufficiently adverse" to induce Ternium's cooperation.  JA50

(AFA Memo); JA29 (*Mueller I*).  Commerce explained that it had assigned

Ternium a total AFA rate (48.33 percent) during the prior review, and this had not

induced Ternium to cooperate during the current review, leading Commerce to

conclude that Ternium refused to cooperate because its data would have been less

favorable.  JA50 (AFA Memo) (citing *Certain Circular Welded Non-Alloy Steel*

*Pipe From Mexico*, 75 Fed. Reg. 20,342, 20,343 (Dep't of Commerce April 19,

2010) (admin. review 2007-08 final results)); JA39-40, 42, 44 (I&D Memo)

(discussing inference against Ternium); JA29-30 (*Mueller I*).

   Next, Mueller quibbles that its acquisition costs are "certainly more

probative" than TUNA's production costs, Mueller Br. 23, but Commerce

reasonably concluded otherwise using its administrative expertise.  JA61-62

(Preliminary Results); JA30 (*Mueller I*).  Congress requires that Commerce

determine the costs associated with Mueller's sales of Ternium products by

calculating "an amount equal to the cost of materials and fabrication or other

processing of any kind employed in producing the merchandise," plus profit and

selling, general, and administrative expenses.  *See* 19 U.S.C. § 1677b(e); JA30

(*Mueller I*).  "There is no dispute that Mueller does not possess all of this

information because it resells rather than produces the merchandise at issue."

JA30 (*Mueller I*) (citing JA37 (I&D Memo).  Commerce also found that Mueller's

acquisition costs for products from its supplier, TUNA, did not equate to the costs

MATERIAL SUBJECT TO PROTECTIVE ORDER OMITTED

of production reported by TUNA for those products.  JA49-51 (AFA Memo); JA30 (*Mueller I*).  Commerce, therefore, reasonably concluded that supplier production costs are more probative than exporter acquisition costs.  JA30 (*Mueller I*) (citing JA37 (I&D Memo)).  Indeed, the Court recently affirmed that Commerce has authority to use unaffiliated suppliers' production costs in lieu of the exporter's acquisition costs when calculating constructed value.  *SKF*, 630 F.3d at 1375-76.

Mueller also suggests that Commerce could have relied upon Ternium's cost data, and incorrectly asserts that Commerce "never found that Ternium's reported production costs were unreasonable or inaccurate."  Mueller Br. 5, 6-7, 22-23. According to Ternium, Mueller exported [    ] different steel pipe products that were produced by Ternium, with diameter sizes ranging from [    ] to [    ] inches, and with thickness ranging from [    ] to [    ] inches.  JA76 (Commerce standard questionnaire instructions to account for pipe size and thickness); JA101 (Ternium's response).  In other words, Mueller exported a large variety of different steel pipe products produced by Ternium with a wide range of dimensions.  *Id.* Yet, Ternium supplied only "limited" cost of production data, and Ternium repeatedly failed to provide cost data with the specificity Commerce had requested, accounting for production costs on a specific, product-by-product basis, even though Ternium's predecessor had provided this information in the past.  JA40-41 (I&D Memo); JA46, 48 (AFA Memo); JA30-31 (*Mueller I*).

Ternium's data only accounted for differences in the cost of production attributable to two product characteristics:  coating (black pipe or galvanized pipe) and finish (plain end or threaded end).  JA77 (Commerce standard questionnaire instructions concerning pipe coating and finish); JA93-96, 97-101 (Ternium responses).  Ternium failed to account for differences in the cost of production attributable to two fundamental product characteristics (the pipe size and thickness dimensions) during the period of review.  JA40-41 (I&D Memo); JA48 (AFA Memo); JA30-31 (*Mueller I*); JA76 (Commerce standard questionnaire instructions to account for pipe size and thickness); JA83-84, 93, 103-06 (Ternium responses).

Commerce found that Ternium "was well aware of the level of documentation requested by {the agency} in administrative reviews," JA49 (AFA Memo), that "Ternium was aware that such record-keeping should have been maintained," and that Ternium "impede{d} {Commerce's} ability to make appropriate comparisons."  JA41 (I&D Memo).  Commerce decided not to use Ternium's limited cost data because of accuracy concerns.  JA40-41 (I&D Memo); JA31 (*Mueller I*).

Commerce explained that Ternium's limited cost data did not "reflect cost differences attributable to the different physical characteristics" of the several dozen products reviewed.  JA41 (I&D Memo); JA31 (*Mueller I*).  Congress requires Commerce to make such adjustments when merchandise, which does not

have identical physical characteristics, is used in determining normal value. JA41 (I&D Memo); 19 U.S.C. § 1677b(a)(6)(c)(ii) (cross referencing 19 U.S.C. § 1677(16)). Commerce did have available to it, however, TUNA's product-specific cost data from which the agency could select the data that was most probative of Ternium's missing product-specific cost data. JA49 (AFA Memo). Therefore, Commerce reasonably concluded that Ternium's limited cost data "was not the most probative facts available in place of Ternium's missing product-specific cost data." JA31 (*Mueller I*). Mueller cannot seriously claim otherwise.

Finally, Mueller argues that Commerce has relied upon acquisition costs in the past, selectively quoting from *SKF*, 675 F. Supp. 2d at 1277-78, which does not support Mueller's argument. Mueller Br. 23. The Court of International Trade in *SKF* stated that "*{b}oth the {production cost} data and* the acquisition cost data had the virtue of bearing a probative relationship to the subject merchandise Commerce was attempting to value," *id.*, not just the acquisition cost data, as Mueller incorrectly suggests. It is beyond peradventure that acquisition costs need not be entirely devoid of *any* probative value for Commerce to find that production costs are *more* probative, which is what Commerce determined here. Indeed, two years after the decision of the Court of International Trade in *SKF*, this Court held that "Commerce can utilize unaffiliated suppliers' records for cost of production data in lieu of the exporter's acquisition cost." *SKF*, 630 F.3d at 1371.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the trial court in favor of the United States.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Trial Attorney
OF COUNSEL:                                    Department of Justice
                                               Civil Division
NATHANIEL J. HALVORSON                         Commercial Litigation Branch
Attorney                                       P.O. Box 480
Department of Commerce                         Ben Franklin Station
Office of the Chief Counsel                    Washington, D.C. 20044
    for Import Administration                  Tel.: (202) 353-9303

September 30, 2013                             Attorneys for Defendant-Appellee
                                               United States

## CERTIFICATE OF SERVICE

I hereby certify that, on this 30th day of September, 2013, I caused to be served electronically to all parties by operation of the Court's electronic filing system, a copy of the foregoing document, "Brief For Defendant-Appellee United States (Nonconfidential Version)."


/s/ Douglas G. Edelschick

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief:  (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B); (2) contains 8,648 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b); (3) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6); and (4) has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2010 in Times New Roman type style and 14 point size.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system that was used to prepare the brief.

/s/ Douglas G. Edelschick